**CONSUMERS UNION OF U. S., INC.,**
**Plaintiff,**

v.

**William P. ROGERS, Secretary of**
**State, et al.**

**Civ. A. No. 1029–72.**

United States District Court,
District of Columbia.

Jan. 8, 1973.

Steven Brodsky, Richard Frank, Center for Law & Social Policy, Washington, D. C., for Consumers Union of U. S., Inc., Mt. Vernon, N. Y.; Victor H. Kramer, Washington, D. C. of counsel.

Irwin Goldbloom, David Anderson, Civ. Div., Irving Jaffe, Dept. of Justice, Washington, D. C., for William P. Rogers, Secretary of State, and Julius L. Katz, Ass't Sec. of State.

Abe Krash, Daniel Z. Rezneck, Jerome I. Chapman, Arnold & Porter, Washington, D. C., Orison S. Marden, Haliburton Fales 2d, White & Case, New York City, for United States Steel Corp.

Max O. Truitt, Jr., Lloyd Cutler, Daniel K. Mayers, Wilmer, Cutler & Pickering, Washington, D. C., Richard L. Grimwade, Bartlett H. McGuire, Richard E. Nolan, Davis, Polk & Wardwell, New York City, for American Iron and Steel Institute.

Noel Hemmendinger, Nelson A. Stitt, John A. Kennedy, Jr., Stitt, Hemmendinger & Kennedy, Washington, D. C., Isaac Shapiro, of Milbank, Tweed, Hadley & McCloy, New York City, for Japan Iron and Steel Exporters Assn.

Milo G. Coerper, Washington, D. C., for Fried, Krupp Huttenwerke, A.G.

Monroe Leigh, Richard A. Whiting, Daniel J. Plaine, Steptoe & Johnson, Washington, D. C., William B. Pennell, Shearman & Sterling, New York City, for British Steel Corp.

Noel Hemmendinger, Nelson A. Stitt, John A. Kennedy, Jr., Washington, D. C., for Nippon Steel Corp.

## MEMORANDUM OPINION, DECLARATION AND ORDER

GESELL, District Judge.

Consumers Union of U. S., Inc., by amended complaint filed October 5, 1972, has challenged the legality of so-called Voluntary Restraint Arrangements on Steel which were mutually made between certain foreign steel companies as a result of negotiations initiated by the Secretary of State at the direction of the President. Under these arrangements, nine Japanese steel companies, British Steel Corp., and various Western European steel manufacturers belonging to the European Coal and Steel Community by detailed agreements undertook to reduce substantially the amounts of steel they would import into the United States for domestic sale. These arrangements, which have been monitored and assisted by the Secretary, were consummated in May, 1972, and are to continue through the calendar year 1974. They affect 85 percent of United States steel imports and were widely publicized through press releases and transmittals to appropriate congressional committees.

Plaintiff, a recognized consumer organization, contends that the actions of the State Department officials in stimulating and implementing these arrangements are, in effect, *ultra vires*, and that no member of the Executive Department, including the President, has power under the Constitution and laws of the United States to enter into or to arrange the resulting restrictions on *foreign commerce in steel.* A declaratory judgment and injunction are sought. The matter comes before the Court on cross-motions for summary judgment, on agreed documents and statements of fact, and the admittedly novel issues

have been very thoroughly briefed and extensively argued.[1]

It was initially alleged that the steel arrangements violate the Sherman Act but this contention was dismissed by plaintiff, with prejudice, although the contention continues to be made in support of plaintiff's general position that any restraint offensive under the antitrust laws cannot be negotiated by the President or his representatives in view of congressional preemption in this field. Plaintiff now asserts that under Article I, Section 8, of the Constitution, Congress has authority to regulate domestic and foreign trade and that the enactment of the Sherman Act, coupled with enactment of the Trade Expansion Act of 1962,[2] blankets the field to the exclusion of any residual power in the President to take unilateral action with private companies which is contrary to the intendment of these statutes. In urging that these two statutes, by implication, deprive the President of any authority which he might otherwise have under Article II of the Constitution, plaintiff emphasizes the scope of antitrust prohibitions and the existence of a specific trade agreement as to steel approved under the congressional scheme for regulatory tariffs and imports.

Defendants respond that only the most general legislation designed to encourage competition and free trade is in effect and that this legislation cannot be read to carry an explicit preemption. Accordingly, the Government suggests the President retains his power in the field of foreign affairs to act through "diplomacy" and bring about such arrangements with private foreign companies as he feels are in the best interests of the country.

■ Obviously this litigation raises novel and difficult constitutional questions which have wide import. The Court recognizes that it will be well advised to avoid any decision that reaches beyond the specific dispute presented. Some observers note a gradual erosion of congressional authority in favor of the Executive, which is said to reflect the growing complexity of our society and widening involvement in foreign affairs. Others suggest the trend reflects stultifying inhibitions built into congressional processes and other factors. The courts have no general role in this shifting emphasis between competing branches of government. It is only when a distinct aspect of the struggle surfaces into a clearly justiciable controversy that a court must act. When this occurs, the Court should apply well-settled legal principles to the limited dispute presented, leaving ultimate solutions to our democratic processes.

■ All parties recognize that if in fact Congress has preempted the relevant field of foreign trade and commerce, then the President lacks authority to act in a manner inconsistent with the requirements of the preemption legislation. The steel arrangements were made although a specific trade agreement as to steel was in effect. Plaintiff points to the failure to ventilate the arrangements in advance under the procedures contemplated by the Trade Expansion Act of 1962 and contends that in view of the breadth of antitrust regulation it is only in this fashion that the President could have proceeded. This goes too far. To be sure, if the avenue chartered in the Trade Expansion Act of 1962 had been available and had been pursued, there would be no question of the legality of the Executive action taken and even immunity under the Sherman Act might well be implied. Although this was not done, there is nothing in the Trade Expansion Act of 1962 that makes its processes exclusive. Nor can it be said that a general statute of

1. Standing is not seriously challenged and is well established by the cases and considerations reviewed in National Association of Railroad Passengers v. Central of Georgia Ry., U.S.App.D.C. (No. 71–1546, decided January 5, 1973).

2. 19 U.S.C. §§ 1801–1991 (1965).

uncertain application like the Sherman Act was intended to preempt from the President his independent authority over foreign commerce. Compare the legislation and facts involved in Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). While the legislative pattern is indeed comprehensive and the President's authority has been narrowed, these acts cannot be read as a congressional direction to the President prohibiting him from negotiating in any manner with private foreign companies as to commercial matters. Far more explicit legislation would be required to deprive the President of this authority in foreign affairs where his preeminent role has quite properly long had firm constitutional recognition.

■ On the other hand, the Government's argument also overreaches. The President clearly has no authority to give binding assurances that a particular course of conduct, even if encouraged by his representatives, does not violate the Sherman Act or other related congressional enactments any more than he can grant immunity under such laws. A flat agreement among private foreign producers mutually to limit a substantial amount of goods to be sold in the United States is a violation of the Sherman Act and to the extent participants are subject to the jurisdiction of our courts criminal penalties may be imposed and civil actions for damage or equitable relief may be pressed. United States v. National Lead Co., 63 F.Supp. 513 (S.D.N.Y.1945), aff'd, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947); see also, United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The President must faithfully execute the law and cannot permit his subordinates to be participants in such a combination or agreement. There is no basis in the Constitution or case law for a contrary conclusion. Defendants cite Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), but the exception from Sherman Act strictures there

recognized was based on legislative action and it cannot be said that the Executive charged with responsibility to execute the law can also create his own exceptions.

■ Obviously when representatives of the Executive Branch venture into areas where the antitrust laws have apparent application, they must proceed with strict regard for legislation outlawing restraints of trade so that no action taken will be inconsistent with the clear requirements of settled national policy. The implications of recognizing authority in the Executive to cartelize segments of our trade need no special emphasis except as they caution against attempting to imply authority where it has been clearly removed.

■ The Court declares that the Executive has no authority under the Constitution or acts of Congress to exempt the Voluntary Restraint Arrangements on Steel from the antitrust laws and that such arrangements are not exempt.

■ The Court further declares that the Executive is not preempted and may enter into agreements or diplomatic arrangements with private foreign steel concerns so long as these undertakings do not violate legislation regulating foreign commerce, such as the Sherman Act, and that there is no requirement that all such undertakings be first processed under the Trade Expansion Act of 1962.

The foreign companies who were apparently persuaded by the Secretary to enter into the steel arrangements proceeded on the stated assumption that the mutual agreements achieved were legal under American law and presumably immune from Sherman Act scrutiny. While official assurances to this effect may or may not have been given, there is no doubt that the companies proceeded in the belief the arrangements were legal under our law and the quiescence of all public authorities of the United States on this score was notable. Because of the Amended Complaint, the question of whether or not a violation of

**1324**

the Sherman Act is present is not before the Court to decide. However, it is apparent on this limited record that very serious questions can and should be raised as to the legality of the arrangements under the Act and that the undertakings of the foreign steel companies were made on a mistaken assumption which at least was encouraged, albeit in good faith, by the Secretary.

The parties are urged to re-examine their positions and premises in the light of this memorandum and the declarations made.

No injunction is appropriate. To the extent the respective motions for summary judgment are inconsistent with the above declarations they are denied. No further proceedings are required. No costs will be awarded.

So ordered.