**RAINBOW NAVIGATION, INC., Plaintiff,**

v.

**DEPARTMENT OF the NAVY, et al., Defendants.**

**Civ. A. No. 85–2560.**

United States District Court, District of Columbia.

Oct. 23, 1985.

Benjamin L. Zelenko, Martin Shulman, Landis, Cohen, Rauh & Zelenko, Washington, D.C., for plaintiff-intervenor Intern. Organization of Masters, Mates and Pilots.

David J. Anderson, Vincent M. Garvey, Linda L. Lance, Leslie K. Shedlin, Charles Sorenson, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

Frank J. Costello, Linwood Holton, Ralph L. Kissick, Charles J. Simpson, Jr., Zuckert, Scoutt, Rasenberger & Johnson, Washington, D.C., for plaintiff; John W. McConnell, Jr., Haight, Gardner, Poor & Havens, of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff, Rainbow Navigation, Inc. (Rainbow), a shipping company in the business of carrying military cargo on the United States-Iceland route, challenges a determination of the Secretary of the Navy pursuant to the Cargo Preference Act of 1904, 10 U.S.C. § 2631, to deprive Rainbow of the preference provided by that statute, on the basis that Rainbow's rates are excessive or otherwise unreasonable. The Secretary's decision may be expected to result in reverting the American military cargo business to Icelandic vessels, as the government of Iceland has been insistently demanding of our government for some time.

Presently pending before the Court is plaintiff's motion for partial summary judgment, which seeks injunctive and declaratory relief pursuant to the Cargo Preference Act, the Armed Services Procurement Act, 10 U.S.C. § 2301, and the Fifth Amendment to the Constitution. As will be seen below, at the heart of plaintiff's motion is a novel issue: may the congressionally-mandated cargo preference for U.S. vessels be revoked for foreign policy reasons?[1]

### I

The material facts are not in dispute.[2] Plaintiff is a small shipping company whose sole business consists of carrying cargo between the United States and Iceland, a route on which it is the only U.S. flag carrier.[3] Rainbow's only ship, the M/V RAINBOW HOPE, is a United States flag ship; it is manned by U.S. citizens; and it operates pursuant to U.S. law and regulations.

Under the Cargo Preference Act, U.S. flag vessels are required to be used to carry military supplies unless the President makes a determination that the freight rates charged by U.S. vessels are "excessive or otherwise unreasonable."[4] 10 U.S.C. § 2631. Prior to Rainbow's entry into the Icelandic trade on May 17, 1984, such cargo was carried exclusively by three Icelandic shipping companies, but as a result of the cargo preference for U.S. flag

---

1. Plaintiff also asserts, in an amended complaint, that the government has impermissibly diverted some cargo on the United States-Icelandic route to U.S. military aircraft in retaliation for plaintiff's challenge by way of this lawsuit. In this regard, plaintiff relies on a stipulation and on a regulation codified at 48 C.F.R. 47.-101(b)(1). Both the facts and the legal issues raised by that claim are entirely distinct from the Cargo Preference Act claim, and neither those facts nor the applicable law have been sufficiently developed by the parties to permit the Court to render a decision on those issues on summary judgment.

2. Defendants' Points and Authorities in Opposition to Plaintiff's Motion for Summary Judg-

ment does not assert that material facts are in dispute.

3. More than 98% of Rainbow's business consists of carrying military cargo between Norfolk, Virginia, and the U.S. military installation in Keflavik, Iceland.

4. The statute goes on to provide that when the President makes such a determination, the American cargo preference is waived and the government may proceed to book the cargo by another appropriate method. The regulations currently in force provide for competitive bidding as the alternative method. See 48 C.F.R. § 47.500 et seq.

ships granted by the statute, Rainbow now carries 70% of the military cargo between Iceland and the United States.

Ever since Rainbow's entry into the Icelandic trade, representatives of the government of Iceland have repeatedly approached U.S. government officials in an attempt to regain the U.S. military cargo trade for the Icelandic shipping companies. Indeed, Icelandic officials have raised the issue personally with the Secretary of State on at least six occasions during the past year.[5]

On August 8, 1985, the Secretary of the Navy issued a one-paragraph memorandum[6] declaring that the rates being charged by United States vessels on the U.S.-Icelandic military cargo route were excessive and otherwise unreasonable, thereby invoking the exception to the cargo preference provisions of the Act.[7] The memorandum stated that the determination was made based on "all relevant circumstances, including consultation with the Secretary of State and the Secretary of Defense," without further elaboration.[8] No dissatisfaction had ever been expressed by the government regarding Rainbow's rates prior to the issuance of the August 8 memorandum, and Rainbow received no notice that such a determination was being considered nor did it have the benefit of a hearing prior to being cut off.[9] In fact, the company learned of the decision only as a result of a joint U.S.-Icelandic press conference in Iceland.

On August 12, 1985, plaintiff filed the instant action, at the same time requesting a temporary restraining order. Prior to the hearing on the TRO, the parties agreed on a stipulation which obviated the need for such an order. The stipulation established a briefing schedule for summary judgment motions, with oral argument set for September 13, 1985.[10]

On September 6, 1985, one week before the scheduled hearing, the Secretary of the Navy issued a second determination that Rainbow's rates were excessive and otherwise unreasonable.[11] This second determination was virtually identical to the first, except for the addition of the underlined language:

> I have reviewed all relevant circumstances, including your memorandum of 30 August 1985, and have consulted with the Department of State and the Secretary of Defense, concerning ocean transportation of military supplies between the United States and Iceland. Pursuant to 10 U.S.C. § 2631, I hereby find that under the existing tariff filed by the United States flag carrier on that route, the rates currently charged by Rainbow Navigation, Inc., are excessive and are also otherwise unreasonable. Proceed to procure ocean transportation service between the U.S. East Coast and Iceland under principles of full and open competition (words no longer appropriate omitted).

---

**5.** Declaration of George Schultz, pp. 2–3. According to the government, the issue of sea transportation has become a matter of great concern to the government of Iceland and a source of friction between it and the United States. Defendants' Points and Authorities, p. 8.

**6.** On the same day, the Military Sealift Command issued a solicitation for bids to carry military cargo on the Icelandic trade route.

**7.** This was the first invocation of that exception in the 81–year history of the statute.

**8.** The entire text of the Secretary's determination is as follows: "I have reviewed all relevant circumstances, including consultation with the Secretary of State and the Secretary of Defense, concerning ocean transportation of military

supplies between the United States and Iceland. Pursuant to 10 U.S.C. § 2631, I hereby find that the rates currently being paid are excessive and are also otherwise unreasonable."

**9.** See *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964); *Art-Metal USA, Inc. v. Solomon,* 473 F.Supp. 1 (D.D.C.1978).

**10.** The government notified the Court by letter dated September 5 that it was unable to comply with the schedule, and that it would therefore simply oppose plaintiff's motion.

**11.** At the same time, the Military Sealift Command withdrew the first solicitation for bids and commenced procedures for a second solicitation.

Plaintiff has challenged the second determination as well, claiming that, despite the government's hasty attempts to meet certain of the plaintiff's procedural objections, that determination is as invalid as the first.

The Court has considered the memoranda and other papers submitted by the parties as well as the arguments made on September 13, and it has decided that plaintiff's position is well taken and that it is entitled to judgment.[12]

## II

■ In its motion for partial summary judgment, plaintiff argues that the determination of the Secretary of the Navy regarding unreasonableness was both procedurally[13] and substantively defective, in that it was arbitrary and capricious and violated both the Cargo Preference Act and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).[14] The government denies that the Secretary's determination was in any way improper.

■ The Cargo Preference Act of 1904 is part of a larger statutory scheme designed to protect and foster American shipping.[15] See *Autolog Corp. v. Regan,* 731 F.2d 25, 30 (D.C.Cir.1984); *Curran v. Laird,* 420 F.2d 122, 127 (D.C.Cir.1969). As the Court of Appeals has recently stated, it is the purpose of the Act and related cargo preference provisions

to create a strong domestic merchant marine capable of competing with foreign carriers in the world market, and each act recognizes that foreign subsidies and high domestic labor costs place American-built and American-operated ships at a competitive disadvantage with foreign vessels in the absence of government assistance.

*American Maritime Association v. United States,* 766 F.2d 545, 548 (D.C.Cir.1985).

The Cargo Preference Act contributes to this congressional purpose by conferring a monopoly on U.S. flag ships over the transportation of military cargo, thus providing American shipping companies with a guaranteed cargo and income. See *States Marine International v. Peterson,* 518 F.2d 1070, 1074 (D.C.Cir.1975).

■ Specifically, insofar as here relevant, the Act provides as follows:

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law.

12. Because the government, pursuant to the schedule entered into between the parties, agreed to maintain the status quo only until October 14, 1985, the Court issued a brief summary judgment order on October 15, indicating that an explanation of the Court's action would be provided later. This Opinion is that explanation.

13. The alleged procedural problems have either been remedied by the Secretary's second determination or they have not been adequately developed by the parties. It is to be noted, however, that the Act reserved the decision-making authority to the President, not some lower-ranking official, see *Curran v. Laird,* 420 F.2d 122, 134 (D.C.Cir.1969), and that there are serious questions about the propriety of the delegation of authority. *Hotch v. United States,* 212 F.2d 280, 283 (9th Cir.1954). In view of the Court's disposition of this case, it is not necessary at this time to consider or decide the procedural or delegation issues.

14. The Secretary's determination is clearly reviewable. *Curran v. Laird, supra.* Plaintiff also claims that the procedures followed by the Military Sealift Command in implementing the Secretary's determination violated the Armed Services Procurement Act, 10 U.S.C. § 2301 *et seq.,* and the Federal Acquisition Regulations, 48 C.F.R. §§ 47.500–45.507.

15. Other statutory provisions which are part of this scheme include, *inter alia,* the Merchant Marine Act of 1936, 46 U.S.C. § 1101, which declares that it is the policy of the United States to foster the development of the Merchant Marine, and the Cargo Preference Act of 1954, 46 U.S.C. § 1241(b), which requires that at least 50% of all government supplies transported by ship must be transported on U.S. flag vessels. See 48 C.F.R. 47.502.

Thus, military cargo may be shipped by sea in foreign flag vessels only upon a finding by the President[16] that the freight rates charged by American shippers are excessive or otherwise unreasonable.[17] In this instance, of course, the Secretary of the Navy has made just such a finding in his memoranda of August 8 and September 6, and the question before the Court is whether the Secretary was in possession of and cited information upon which the determination to invoke the statute's escape clause could legitimately be made. Absent some such information, the determination would be arbitrary and capricious and not "a product of reasoned decisionmaking based upon a consideration of the relevant factors." *Motor Vehicle Manufacturers Association v. EPA*, 768 F.2d 385 (D.C.Cir. 1985); see also, *Motor Vehicle Manufacturers Association v. State Farm Mutual*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

### III

■ A threshold question, of course, is what constitutes an "excessive and unreasonable freight [charge]" within the mean-

ing of the Act. The statute and the accompanying regulations provide no guidance,[18] and the legislative history is inconclusive.[19] As noted above, however (see note 19), the government itself acknowledges that Congress intended that U.S. vessels would receive a preference at remunerative rates, and that U.S. ship owners are at a minimum entitled to a "fair profit."[20]

■ In making the September 6, 1985, determination of unreasonableness,[21] the Secretary had essentially two pieces of information before him upon which to base his assessment of economic unreasonableness: (1) charts comparing Rainbow to military cargo carriers on other routes, based on measurement-per-ton and price-per-container rates, showing Rainbow's rates to be substantially higher than those of other carriers serving other routes;[22] and (2) a memorandum from the Commander of the Military Sealift Command recommending a finding of excessive rates based upon those charts and upon the fact that Rainbow charged the Navy the same rates charged by Icelandic carriers prior to Rainbow's entry to the trade.[23]

**16.** But see note 13, *supra*.

**17.** Foreign vessels may also be utilized if American ships are not available. *Curran v. Laird, supra*, 420 F.2d at 127–28.

**18.** However, a 1907 Opinion of the Attorney General appears to equate "excessive or otherwise unreasonable" with "exorbitant and unreasonable." 26 Op.Atty.Gen. 415, 418–101 (1907). In a somewhat parallel statute, the term "excessive profits" is defined as "profits that are unconscionable or amount to the unjust enrichment of contractors or subcontractors." 10 U.S.C. § 2382(a)(3).

**19.** The plaintiff argues that the legislative history indicates that Congress meant that the rates had to be "exorbitant" or constitute "extortion" —a much higher standard than only allowing a "fair profit" to ship owners, as the government contends. Both standards are mentioned in the legislative history. *Compare* 38 Cong.Rec. 2409, 2475 (Feb. 26, 1905) *with* 38 Cong.Rec. 2476–77, 2596. The Court will accept the government's characterization of the standard for present purposes although it is not at all clear that that minimum standard faithfully expresses the congressional intent.

**20.** See Defendants' Points and Authorities at p. 30 n. 21. See also, S.Rep. No. 182, 58th Cong., 2d Sess., at 3; H.R.Rep. No. 1893, 58th Cong., 2d Sess., at 4–6.

**21.** The August 8 determination was essentially mooted by the September 6 determination. For purposes of this analysis, the Court has assumed that, in making the later determination, the Secretary had before him both information presented to him in connection with the earlier determination as well as additional information acquired prior to the later determination.

**22.** For example, the charts established that on a measurement per ton rate basis, Rainbow's rates were 5.9 times higher than the rates on the U.S.-Europe route and 2.5 times higher than the Seattle-Adak, Alaska route. See Defendants' Exhibit 8.

**23.** The Secretary had also a half-page memorandum from the Assistant Secretary of the Navy concurring with the recommendation of the Commander of the Military Sealift Command, and stating, without explanation or elaboration that Rainbow priced the service off commercial rates, and that an (unspecified) analysis indicates that profitable operations can be achieved

Neither set of documents contained evidence relevant to the question whether Rainbow was, in fact, earning more than a fair profit, if only because none of the documents contains anything about Rainbow's actual costs or profits.

■ To begin with, the charts relied upon by the Secretary do not provide facts relevant to a determination of the reasonableness of Rainbow's rates, in addition to being otherwise deficient and inconclusive. Those charts simply compare rates on a per ton and per container basis; that is, they establish, for example, that one company charges roughly $1,200 per container for a trip from the United States to Europe while Rainbow charges $7,500 per container for a trip from the United States to Iceland. The charts do not take into account the difference in mileage between one route and another, the time required to travel the route, the service provided, or any other relevant factors.[24] To draw an analogy, the chart amounts to nothing more than a comparison between one airline charging $45 per passenger to fly from Washington to Boston and another which charges $349 to fly from New York to Seattle. In addition to adjusting a comparison of rates between routes to accomodate differentials in distance, any such comparison, to be valid, must necessarily also consider such other relevant factors bearing on those rates as the size of the ships used and any resulting economies of scale, the traffic volume on the route, the number of trips per year the distance and weather conditions permit, and the like. Rainbow ran one small ship on a low volume route over a great distance; the fact that it charged more to carry a container to Iceland than another company might charge to carry the same container to Europe may simply be a reflection of higher costs. Thus, the charts do not contribute at all to an analysis of whether any carrier on the chart, including Rainbow, is earning a "fair profit." See also, note 23, *supra*.

■ The Memorandum from the Military Sealift Command, which asserts that Rainbow adopted the rates previously charged by Icelandic carriers,[25] likewise fails to consider in any way Rainbow's costs or profits, and it is inconclusive on its face as to reasonableness. In fact, when Rainbow's military cargo rates are compared to the Icelandic commercial cargo rates on the route, which are several thousand dollars per measurement ton higher than the Rainbow military cargo rate, the Rainbow rate would appear to be eminently reasonable. However, the Secretary failed to make even so basic a comparison.

In short, it is evident that the few factors the Secretary did consider in making the determination simply have no bearing on whether Rainbow was achieving more than a "fair profit," much less that they are exorbitant (see note 19, *supra*). It is therefore difficult to escape the conclusion that the Secretary's economic findings, rudimentary as they are, were nothing more than an after-the-fact attempt to shore up a decision made on other grounds. See Part IV *infra*.

with rates about 60% of the current level. These conclusory statements are unaccompanied by any underlying data, and they therefore cannot be assigned any weight. Moreover, there are at least three objective factors indicating that the Assistant Secretary was wrong: (1) the only actual rates charged on the Norfolk-Keflavik route, that of the Icelandic vessels, were not lower than Rainbow's; (2) no U.S. shipping company has seen fit to compete with Rainbow at lower rates; and (3) the military rates charged by Rainbow were far below the commercial rates charged on the same route by Icelandic companies.

**24.** Even within the scope of the deferential nature of the courts' review under the circumstances, the Court has the responsibility, at a minimum, to ensure that the Secretary took into account relevant factors in reaching his decision. See *Wawszkiewiez v. Dept. of the Treasury,* 670 F.2d 296, 301 (D.C.Cir.1981); *Environmental Defense Fund v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981).

**25.** It is not apparent why that fact, without more, would support the conclusion that Rainbow's rates are excessive. The pricing equality could as easily indicate that the rates charged both by the Icelandic companies and by Rainbow are fair market rates.

Additionally, there is affirmative evidence that Rainbow's rates were not excessive or unreasonable. Thus, prior to Rainbow's entry into this trade in May 1984, the rates were set by competition among the Icelandic carriers; yet, as noted, Rainbow set its rates at levels that were no higher than those established by that comparative environment.[26] Further, there is evidence that the nature of Rainbow's service is such that the use of Rainbow's ship reduces the military's overall costs by about 9%. Finally, the military has *never* complained about Rainbow's rates or service; the only complaint Rainbow received was that of the Icelandic companies which charged that the company's rate for certain commercial shipments was *too low* (although that rate was higher than the military rate).

Even with a deferential standard of review, the Court finds that the Secretary's determination of economic excessiveness is not the product of reasoned decisionmaking based upon a consideration of the relevant factors and is therefore not in accordance with law.

### IV

The government's position suffers from an even more fatal defect. It is apparent from the face of the record that the Secretary's determination was not based solely or even primarily on freight rates—as the statute requires—but on what has been characterized by both plaintiff and the government as foreign policy, political, or geopolitical grounds. The government concedes that foreign policy considerations contributed to the Secretary's determination; at oral argument government counsel

stated that "the decision was a political one;"[27] and it is obvious from the record which is before this Court that the many entreaties of the Icelandic government to the Secretary of State (see note 5, *supra*) had a great deal to do with the Navy's ultimate decision or, more likely, that they were the only or the decisive basis for that decision. Yet there is nothing in the language of the statute or its legislative history to support the conclusion that the Executive Branch may disregard the cargo preference granted by law to U.S. vessels on account of political considerations.

The government meets this problem head-on, arguing that the determination of excessiveness is committed to the broad discretion of the Executive Branch, and that the President, through his designees, may consider all relevant circumstances, including foreign affairs concerns. Indeed, the government contends that the Act contains broad, discretionary language in an area particularly within the President's province—the realms of foreign affairs and military policy.

■ The question whether that argument is acceptable depends upon the nature of the authority Congress delegated to the President (or his designees) in granting him the power to make the determination of excessive or unreasonable rates.[28] If in the Cargo Preference Act Congress delegated to the President authority to make a decision in the province of foreign affairs, clearly the courts would have no authority to second-guess the President's decisions or those of his designees with respect thereto. See *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350,

---

**26.** The government asserts that the Icelandic carriers' rates may have been the result of monopoly pricing rather than of competition. Even if this were so, it would still undercut the government's claim that Rainbow's rates are unreasonable. With the elimination of Rainbow as a factor, it is inevitable that Icelandic monopoly pricing will return to the military trade—just as it has always existed, and continues to exist in the commercial cargo trade. In short, upon an elimination of the cargo preference, the government will, at a minimum, be paying the same rates as now—only it will pay

them to Icelandic shipping companies rather than to a United States company. Such a result clearly defeats the purpose of the Cargo Preference Act. See discussion, *supra*, in Part II.

**27.** Tr. 24–25. Counsel added that economic factors were also taken into account. See also Defendants' Points and Authorities at 33, 35–37.

**28.** See *Atkins v. United States*, 556 F.2d 1028, 1069, 214 Ct.Cl. 186 (1977).

77 L.Ed. 796 (1933). But the problem with the government's argument is that none of the discretion vested in the President by the Cargo Preference Act involves foreign, military, or geopolitical policy.[29]

■ The statute does not state, as the government would have it, that the U.S. cargo preference provisions may be overridden or waived if the President finds that the *use* of U.S. vessels would be unreasonable;[30] the statute mandates that these provisions may be disregarded only if the *"freight charged"* by such vessels is unreasonable.[31] In other words, what is involved here are not vast geopolitical, foreign affairs, or national defense issues, but only the economic question whether Rainbow's freight rates are excessive or otherwise unreasonable. Yet in making an affirmative finding on that issue, the Secretary took decisively into account American foreign policy concerns vis-a-vis the Icelandic government—a factor which is wholly unrelated to the economic decision the President was called upon to make under the law.[32]

The legislative history of the Act strongly supports the conclusion that the Secretary's consideration of geopolitical considerations is unauthorized by law. The Cargo Preference Act is first and only a statute designed to protect and nurture the American maritime industry. It was enacted out of concern that the United States might be dependent upon foreign shippers to carry military supplies during wartime if the United States lacked a strong national merchant marine. The American maritime industry during the early 1900s was floundering, struggling to compete with heavily subsidized foreign shipping companies. H.R.Rept.1893, 58th Cong., 2d Sess., 4–5. To ensure that an American merchant marine could operate in a trade promising a fair profit to their owners, Congress elected to provide U.S. flag ships with a monopoly in carrying military cargo, thereby guaranteeing the merchant marine a steady stream of business. *Id.* at 4–5. Aside from providing direct military advantage, the bill was designed to benefit the entire American shipping industry, from the shipbuilders to working sailors. *Id.* at 5. In short, the statute was a piece of protective domestic legislation, designed to insulate American shipping from foreign competition and to protect against American dependence upon foreign shipping to transport military supplies during war.

The legislative history further indicates that the exception to the Act which is at issue here was enacted solely out of a concern that American shippers might abuse the monopoly power thus provided to them by charging the government exorbitant rates. 38 Cong.Rec. 2412 (February 26, 1904). As noted, the version of the bill finally passed provided that the mandate of the Act could be waived if the President made a finding that the freight rates charged were excessive or otherwise unreasonable. Other proposed checks, all ultimately rejected, were to include a ceiling for the rates based on a percentage over foreign rates charged or a ceiling based upon the shipping company's commercial rates in the same trade. See 38 Cong.Rec. 2415, 2458.[33]

---

**29.** See *Atkins v. United States, supra,* 556 F.2d at 1069; *Consumers Union of the United States v. Rogers,* 352 F.Supp. 1319 (D.D.C.1973); See also, Van Alstyne, the Role of Congress in Determining Incidental Powers of the President and of the Federal Courts, 36 Ohio St.L.J. 788, 794 (1975).

**30.** If that phraseology had been used in the statute, presumably all of the President's powers, including those over foreign affairs and national defense, could appropriately have been brought into play.

**31.** The regulations implementing the Act likewise state that U.S. flagships must be used "unless those vessels are not available at fair and reasonable rates." 48 C.F.R. § 47.502.

**32.** The weakness of the government's position is underscored by its almost frivolous attempt to read the word "otherwise" in the phrase "freight charged ... is excessive or otherwise unreasonable" as referring to subjects other than freight rates. Defendants' Points and Authorities at 18.

**33.** At no point in the legislative history was there any indication that the presidential decision would be anything more than a check upon economic extortion. See *id.* at 2475. All of the floor debates on the bill centered on the ques-

 Most significantly, the exception in the original Senate version of the bill included a provision *permitting the President to suspend the Act "whenever, in the interests of the national defense, or for the protection of the interests of the government, such suspension may seem desirable." 38 Cong.Rec. 2412. This language was eliminated by the Senate* and the "excessive or otherwise unreasonable" freight standard was substituted because of concern expressed by several Senators that otherwise the authority delegated to the President would be too broad. *Id.* at 2475–76. Specifically, Congress did not want to grant such broad authority "that the President shall absolutely have the right to countervail a law." *Id.* at 2475.[34] To solve this problem, Congress substituted language that in its view would require the President to find a "specific fact" rather than language that would have committed to the President "in his uncontrolled discretion, the question whether or not a general law shall be operative or whether it shall be suspended, either temporarily or permanently." *Id.* at 2474. The provision finally agreed upon was thus quite deliberately a far cry from one allowing the President to suspend the Act based upon whatever circumstances he or his designees might deem relevant, including foreign policy factors.

While conceding that neither the statute itself nor the legislative history mentions foreign affairs or national security as justifications for waiving the provisions of the Act, the government argues that the President may nonetheless consider such factors as long as the Act does not, in so many words, forbid him from doing so. The difficulty with that argument is that the Act does just that. The statute mandates affirmatively that "only vessels of the United States" may be used for transporting military supplies, and it then goes on to establish a single, specific exception, to operate if the President finds that the freight rates charged by those vessels are excessive or otherwise unreasonable. If words mean anything, that statutory language means that there are to be no other exceptions to the positive mandate of the law requiring military supplies to be transported in United States ships.[35]

In short, both a straightforward reading of the Act and an examination of its legislative history support the conclusion that geopolitical or foreign affairs considerations are not permissible factors for displacing United States vessels from the military cargo trade. It follows that any expansion of the exception to the Act to accommodate foreign policy or other considerations would require congressional action.[36]

However desirable it might seem to one or more departments of the Executive Branch to develop and nurture good relations with Iceland, they have no authority to do so in defiance of a congressional mandate and to the detriment of American citizens or companies. See *American Cetacean Society v. Baldridge*, 768 F.2d 426, 444–45 (1985), where the Court of Appeals held that the Secretary of Commerce was required to certify Japan as not adhering to an international whaling quota even though the Executive Branch interposed objections based on foreign affairs considerations and

---

tion of how best to provide the President with the authority to protect against exorbitant rates set by cartels taking advantage of the noncompetitive market, a fear engendered by the monopolistic structure of the merchant marine industry in the early 1900s. The provision ultimately enacted, the exception at issue here, was exclusively an attempt to ensure that the government would not have to pay unreasonable freight charges to ship military cargo. *Id.* at 2409.

**34.** As Senator Bacon stated, "It can not be put simply upon the ground if the judgment of the President as to the interest of the United States. There must be some specific fact found." 38 Cong.Rec. at 2475.

**35.** The appropriateness of the utilization of foreign vessels when American ships are not available (see note 17, *supra*) cannot be regarded as a true exception to the statutory purposes.

**36.** *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

**544**

had entered into an agreement on the subject with Japan.

For the reasons stated, the Court grants plaintiff's motion for partial summary judgment, and it issues an injunction which restores plaintiff's preference with respect to the carriage of U.S. military supplies between the United States and Iceland in conformity with law.