**RAINBOW NAVIGATION, INC., Plaintiff,**

v.

**DEPARTMENT OF the NAVY, et al., Defendants.**

Civ. A. No. 88–0992.

United States District Court, District of Columbia.

May 17, 1988.

Jeffrey Hunter Moon, Asst. U.S. Atty., Washington, D.C., for defendants; Richard Haynes, Daniel W. Wentzell, E. Duncan Hamner, Chaina Swedarsky, Alan W. Mendelsohn, Samuel Novello, Office of General Counsel, U.S. Dept. of the Navy, Washington, D.C., of counsel.

Karen Hastie Williams, Clifton S. Elgarten, Stuart H. Newberger, Crowell & Moring, Washington, D.C., for plaintiff.

Benjamin L. Zelenko, Martin Shulman, Landis, Cohen, Rauh & Zelenko, Washington, D.C., for intervenor Intern. Organization of Masters, Mates and Pilots.

OPINION

HAROLD H. GREENE, District Judge.

I

This is the third time that these parties have been before the Court with respect to similar controversies.[1]

---

1. The parties are the Department of the Navy    and some of its officials, Rainbow Navigation,

In October 1985, at the request of Rainbow Navigation, Inc. (Rainbow), the Court issued an injunction against the Department of the Navy, restraining Navy plans to deprive Rainbow of the preference granted to it by the Cargo Preference Act of 1904, 10 U.S.C. § 2631. It appeared that the Secretary of the Navy had determined that Rainbow's rates were "excessive and otherwise unreasonable"—if true, a valid reason for denying it the otherwise available preference. But after briefing and hearing, the Court found that the Secretary's findings "were nothing more than an after-the-fact attempt to shore up a decision made on other grounds." *Rainbow Navigation, Inc. v. Department of the Navy*, 620 F.Supp. 534, 540 (D.D.C.1985). More specifically, the Court concluded that the Navy's determination was not based on Rainbow's freight rates but on "foreign policy, political, or geopolitical grounds." *Id.* at 541.

What had happened was that the Department of State, desirous of good relations with Iceland, an ally of the United States, gave in to entreaties from that nation for the recapture of the U.S. military cargo trade exclusively for Icelandic shipping interests.[2] The determinations, declarations, and representations made to the Court regarding Rainbow's allegedly excessive rates, it had turned out, not only were not borne out by the facts but were merely a pretext obscuring the real foreign policy purposes of our government.

Since Rainbow was not in violation of the Cargo Preference Act, and was entitled under law to the benefits of the Act, the Court issued an injunction which required the restoration of that company's preference with respect to the carriage of U.S. military supplies between this country and Iceland in accordance with the Act. The Court of Appeals, in an opinion by then Judge Scalia, affirmed this Court's decision. *Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072 (D.C. Cir.1986).

While the issues regarding this Navy attempt to bypass the law were still in the courts, the Department engaged in yet a second subterfuge designed to elbow Rainbow out of the Icelandic trade. This time the Navy sought to dispense with Rainbow's services by a diversion of the cargo at issue to military aircraft. Government regulations provided that "the preferred method of transporting supplies for the Government is by commercial carriers," and that government aircraft may be used only "if . . . they are available and not fully utilized. . . ." 48 C.F.R. 47.101(b)(1). Once again, solemn declarations were submitted to the Court to the effect that all missions that carried cargo from Iceland to this country were scheduled there "for purposes other than the carriage of cargo back to the United States" and that "missions were not flown to [Iceland] for the purpose of picking up [such] cargo." This, too, was untrue.

The evidence showed that, after the then lawsuit was filed, a sharp increase occurred in the number of flights from Iceland to this country, and a corresponding decrease in the amount of cargo carried by Rainbow. The Court ultimately concluded that the Navy had once again taken steps unlawfully to squeeze Rainbow out of the Icelandic trade. Memorandum Order dated October 17, 1986.[3] This brings us to the current phase of the litigation.

## II

On September 24, 1986, the United States and Iceland signed a treaty, including a memorandum of understanding (MOU),[4] regarding the same military cargo

---

Inc., the International Organization of Masters, Mates & Pilots (the Union), and Iceland Steamship Co., Ltd. (Eimskip). Eimskip is before the Court for the first time in the current phase of the litigation.

**2.** Rainbow may be the only effective competitor of the Icelandic shippers.

**3.** Partial Summary Judgment was granted to Rainbow as it had requested.

**4.** Treaty between the United States of America and the Republic of Iceland to Facilitate their Defense Relationship, with related Memorandum of Understanding, September 4, 1986. The United States Senate ratified the treaty and

route between the two countries that had been at issue previously.[5] That treaty provides for a competition between United States flag carriers and Icelandic shipping companies for the transport of military cargo between the two countries. The method by which the competition is to be carried out is described in the memorandum of understanding as follows:

> Each competition shall result in contract awards to both an Icelandic shipping company and a United States flag carriers such that not to exceed 65 percent of the cargo shall be carried by the lowest bidder and the remainder shall be carried by the next lowest bidder of the other country....

Pursuant to the treaty and the MOU, a single competition was held in 1987 for the carriage of one year's worth of military cargo on the United States–Iceland route. Eimskip, an Icelandic concern, was the "lowest bidder," receiving 65%, and Rainbow took the remaining 35% as the "next lowest bidder." However, this year the Navy planned to change the process. Acting through the Military Sealift Command,[6] the Navy has announced that it intends to hold two separate competitions, separately priced—one competition for the 65% of the cargo, the other, a separate competition, for the remaining 35% of the cargo.[7] Had Rainbow[8] not filed this action to stop the procurement as violative of the treaty, the MOU, and the Administrative Procedure Act, the Navy would have awarded contracts for the two portions of the cargo carriage on April 25, 1988.[9] However, since April 15, 1988, the Navy has been under a temporary restraining order enjoining it from proceeding with the 1988 procurement in the manner planned.

### III

■ Before the Court can reach the substance of Rainbow's complaint, it must address the Navy's threshold defenses—that Rainbow lacks standing to sue, that the Court has no jurisdiction, and that sovereign immunity bars the action. None of these defenses has merit; only the standing issue deserves extended discussion.

■ The Navy suggests that Rainbow lacks standing because neither the treaty nor the MOU expressly grants a private right of action.[10] However, the absence of

memorandum of understanding on October 8, 1986.

5. Before the treaty was signed and ratified, the Navy proposed a regulation that, as the Senate recounted in its report on the treaty, "purported to interpret the 'excessive or otherwise unreasonable' provision in the 1904 [A]ct, but that would have, in effect, given the Secretary of the Navy the discretion to waive the [A]ct at any time." S.Rep. No. 27, 99th Cong., 1st Sess. 3 (1986). This appears to have been yet another attempt to oust Rainbow from the Icelandic trade route.

6. The Military Sealift Command is the United States contracting agency responsible for procurements for the United States–Iceland military cargo sea route.

7. The Request for Proposals for these competitions was issued on March 25, 1988. In addition to holding two competitions instead of one, other changes in the RFP included that all the cargo would be charged on a straight freight basis (rather than permitting the carrier of the 35% to use a time charter), that vessel specifications would no longer be required, that the Icelandic port of destination would be Rekjavik, much farther from the U.S. military base than Njardvik, that there would be no established schedule for travel, and that there would be no small business set aside. Rainbow complains about these changes as well, but the Court need only rest its preliminary injunction on the Navy's violation of the treaty and MOU.

8. While the Court herein generally refers for the sake of convenience only to Rainbow on the plaintiffs' side of this litigation, the Union has intervened; it is proceeding on the basis of the same arguments as those made by Rainbow; and it is entitled to the same benefits flowing from the Court's orders. *See* note 1, *supra.*

9. None of the changes from the 1987 requirements (*see* note 7, *supra*) may become effective if their purpose or effect would be to interfere, directly or indirectly, with the preliminary injunction or the Rainbow and Union rights recognized herein.

10. In the Administrative Procedure Act, Congress conferred the right of judicial review upon any person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Potential and actual government contractors have standing to proceed in district court to challenge a procurement under the Administrative Procedure Act. *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 861–873 (D.C.Cir.1970).

an express grant is not determinative. When a treaty is not explicit on the question whether it is of its own force a part of United States domestic law, a court must interpret it to effectuate the intent of the signatory parties.[11]

■ As the Court of Appeals for this Circuit concluded in *Diggs v. Richardson,* 555 F.2d 848, 851 (D.C.Cir.1976); and *Cardenas v. Smith,* 733 F.2d 909, 918 (D.C. Cir.1984),[12] the language of a treaty may manifest an intent by the signatories that it be or not be self-executing, and if the language is uncertain, resort may be had to the circumstances surrounding the treaty's execution to ascertain that intent. *Id.*[13] A court interprets a treaty as self-executing unless "the agreement manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation, or in those rare cases where implementing legislation is constitutionally required."[14] Applying these standards, the Court has no difficulty concluding that the United States–Icelandic treaty does not require implementing legislation.[15]

In the first place, the government has offered no evidence to rebut the presumption (*see* text to note 14, *supra*) that the Iceland treaty was intended to be effective as domestic law. That alone should end the matter. But there is also ample positive evidence of the self-executing nature of the treaty.

The language of the treaty itself suggests that it was intended to operate of its own force upon ratification. Article I declares that cargo transportation services "shall be provided" on the basis of a competition between United States and Iceland shipping companies which will "ensure" the continued well-being of shippers from each country. Since the subject of the treaty is U.S. military cargo, it is implicit that the United States contracting authority would carry out the competition. This understanding is borne out by the terms of the MOU which explicitly refer to the United States contracting authority.[16]

Similarly, the treaty goes on to state in Article IV that the "provisions of this Treaty and any implementing arrangements concluded pursuant to Article I shall apply notwithstanding any prior inconsistent law or regulation of the United States of America...." Thus, the treaty mandates in terms that, for domestic law purposes, it displaces existing American law.

Perhaps even more significant than the treaty language are the representations made by Executive Branch officials to the United States Senate in connection with the ratification proceedings. These statements, discussed below, clearly support the interpretation that rights would vest without further legislation, for the officials represented to the Senate that if ratified, the treaty would protect the existing U.S.-flag presence on the United States–Iceland route.[17]

11. Restatement (Second) of Foreign Relations § 154 (1965).

12. *See also People of Saipan v. Department of Interior,* 502 F.2d 90, 97 (9th Cir.1974).

13. Reference by courts to contextual factors surrounding a treaty in order to determine whether it is self-executing occurred even in the politically charged atmosphere of Iranian seizures of property and a suit a against a foreign government. *See American International Group v. Islamic Republic of Iran,* 493 F.Supp. 522 (D.D.C. 1980).

14. Restatement (Second) Foreign Relations (Revised) Tentative Draft No. 1 (1980) § 131.

15. Were the treaty not to be read as self-executing, it would not become part of United States

domestic law. As a result, Rainbow presumably could sue for relief under the Cargo Preference Act. However, that was not the intent of the two governments when they signed the treaty.

16. As Article I is written, the United States may not qualify or modify the obligations placed upon it by the treaty through legislation or administrative regulation. *See British Caledonian Airways Ltd. v. Bond,* 665 F.2d 1153, 1161 (D.C.Cir.1981).

17. The Department of Justice disavowed in court the representations made by the Navy and the Department of State to the Senate during treaty ratification proceedings as merely "precatory" and "non-binding." Hearing on Rainbow's motion for a temporary restraining order, April 15, 1988. This position is disturbing since it undercuts the foundation upon which Senate

Thus, at the hearings on ratification of the treaty, the Honorable Edward J. Derwinski, Counselor of the Department of State, with Rear Admiral Walter T. Piotti, Jr., Commander of the Military Sealift Command, at his side, assured the Senate that he agreed with the statement by American maritime organizations of which the following paragraph is a part:

The Administration must further assure that the Treaty, if ratified, will be implemented in such a fashion that the existing United States-flag service in the Iceland trade will not be disadvantaged. In other words, the United States-flag presence and the maritime employment will be maintained just as if the 1904 Act were fully in effect in the Iceland trade.[18]

Similarly, on the question as to how the treaty would affect Rainbow, the only U.S.-flag carrier on that route, Senator Mathias asked and Mr. Derwinski replied:

SENATOR MATHIAS: What about the current American flag carrier? Are there any plans in effect to save harmless the *current cargo carrier* that is now carrying supplies to the [U.S.] military base in Iceland?

DERWINSKI: My understanding is that the current carrier has been involved in a number of discussions with appropriate authorities, and despite the fact that we could not provide, obviously, within the treaty for specific protection for an entity, we did have in mind at all times the need to *protect the interests of the current carrier* (emphasis added).[19]

Relying in part upon these representations, the Senate Foreign Relations Committee recommended that the Senate ratify the treaty. In fact, the Committee stated in its report to the full Senate that advice and consent were being conditioned upon three assurances given by the Departments of State and Defense, one of them being that

the treaty will be implemented in such a way that the existing United States-flag service in the Iceland trade would not be disadvantaged as a result of the Treaty. The Committee received these assurances at its hearing and recommends advice and consent on that basis only.[20]

Two days after the Committee Report was issued, and on the day the Treaty was ratified, Senator Pell repeated this condition of ratification on the Senate floor.[21]

This history clearly shows that the Senate was concerned about protecting the interests of the current American carrier;[22] that to give meaning to that concern, it intended the treaty to provide that protection without further requirements; and that the Executive Branch agreed.

By even raising the standing issue, the Navy is adding to its pattern of false representations discussed in Part I, *supra.* Having assured the Senate that the treaty would not disadvantage the "existing United States flag service ... [and that] United States presence and the maritime employment will be maintained" as under the Cargo Preference Act, the Navy is now arguing through its counsel that this assurance is meaningless unless new implementing legislation is first enacted. No mention

ratification was based, at least in part. As Professor Henkin recently testified:

The President can only make a treaty that means what the Senate understood the treaty to mean when the Senate gave its consent ... The Senate's understanding of the treaty to which it consent is binding on the President. He can make the treaty only as so understood. He cannot make the treaty and insist that it means something else ... the Constitution clearly implies[ ] that it is what the Senate understands the treaty to mean—that is what the treaty means for purposes of its consent.

The ABM Treaty Interpretation Resolution, Report of the Committee on Foreign Relations United States Senate, S.Rep. No. 164, 100th Cong., 1st Sess. 49 (1987). *See also* Restatement (Second) Foreign Relations Law of the United States (Revised), Tentative Draft No. 6 (1985), § 314, comment d and § 314(2).

18. *United States–Icelandic Treaty on the Carriage of Miliatry Cargo: Hearings on the Treaty Before the Comm. on Foreign Relations,* 99th Cong., 2nd Sess. p. 9 (1986).

19. *Id.* at 11.

20. S.Rep. No. 27, *supra,* note 5.

21. 132 Cong.Rec. S15661 (daily ed. October 8, 1986).

22. As this discussion illustrates, Rainbow has standing since it could hardly be more directly within the "zone of interests" protected by the treaty.

appears to have ever been made to the Senate or its committee regarding implementing legislation or the need therefor, and the Administration has never proposed such legislation.

The Court concludes that the Iceland treaty is self-executory and that Rainbow and the Union have standing to bring this action.

■ As to the other threshold defenses advanced by the Navy, they either fall away upon the determination that the treaty is self-executing or they are otherwise unfounded. The Navy protests that the Court lacks subject matter jurisdiction over Rainbow's claims, but according to 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under ... treaties of the United States." *See also* U.S. Const. Art. VI Cl. 2. And it is of course well established that the review provision of the Administrative Procedure Act, 5 U.S.C. § 502, waives sovereign immunity for injunction actions.[23]

## IV

■ The Court now turns to the merits of Rainbow's complaint and its request for a preliminary injunction.[24] Rainbow alleges that the 1988 Navy procurement for the United States–Iceland route is contrary to the language and the purposes of the memorandum of understanding. The Navy's answer is that two competitions between American and Icelandic shippers are permitted by the treaty and MOU—one competition for 65% of the cargo, and a second competition for 35% of the cargo. In the opinion of the Court, that construction of the treaty and the MOU is untenable.

The language of the MOU[25] is straightforward and unmistakable:[26]

> ... *Each competition* shall result in contract awards to both an Icelandic shipping company and a United States flag carrier such that not to exceed *65 percent* of the cargo shall be carried *by the lowest bidder* and *the remainder* shall be carried *by the next lowest bidder of the other country* ... (emphasis added).

Thus, according to the MOU, for any given shipment period, there is to be a single competition dealing with 100% of the cargo. At each such competition, the Navy awards up to 65% of the cargo to the lowest bidder—a shipper from either country—and the remainder, 35% of the cargo or more[27] to the *next lowest bidder*—a shipper from the other country.

However, under the Navy's construction of the MOU, and under the awards proce-

---

23. *See Warin v. Director, Department of Treasury*, 672 F.2d 590, 591–92 (6th Cir.1982); *Neal v. Secretary of Navy*, 639 F.2d 1029, 1036–37 (3d Cir.1981); *Jaffee v. U.S.*, 592 F.2d 712, 717–719 (3d Cir.1979); *Beller v. Middendorf*, 632 F.2d 788, 796–97, 799 (9th Cir.1980).

24. To prevail on a motion for a preliminary injunction, Rainbow must show (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will be irreparably harmed if an injunction is not granted; (3) that the interests of all affected parties are properly balanced by the said relief; and (4) that the public interest is clearly served by the issuance of an injunction. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958).

25. An MOU is an international executive agreement which must be interpreted according to the principles applicable to treaties. *Air Canada v. U.S. Department of Transportation*, 843 F.2d 1483, 1486 (D.C.Cir.1988). The general rule in interpreting treaties is:

The clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982), *quoting Maximov v. United States*, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963).

26. "An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its objects and purpose." Restatement of the Law (Second) Foreign Relations Law of the United States (Revised), Tentative Draft No. 6 (1985), § 325(1). This same rule of interpretation is prescribed by the Vienna Convention of the Law of Treaties Article 31(1). S.Exec.L. 92d Cong., 1st Sess. (1971), 8 I.L.M. 679. As the State Department has noted, "the Convention is already recognized as the authoritative guide to current treaty law and practice." *Id.*

27. More than 35% of the cargo will be so awarded if the lowest bidder takes less than 65%.

dure it contemplates, the "next lowest bidder" will never receive any portion of the contract. That result is achieved by having two competitions rather than one: once the lowest bidder from one country wins the contract for 65% of the cargo, instead of the remainder going to the next lowest bidder, a second competition is held for that remainder at which, again, the lowest bidder prevails. With respect to neither competition will the "next lowest bidder" even be considered; it would have to be the lowest bidder in the second competition to receive any portion of the contract.[28] The language in the MOU referring to the "next lowest bidder" is simply disregarded and given no effect.

The language of the MOU—which the Court finds to be unambiguous in its support of Rainbow's position—is further buttressed by the construction placed thereon by the Secretary of Defense himself. Secretary Carlucci wrote as follows on March 25, 1988 to Senator Lugar of Indiana, a member of the Committee on Foreign Relations: [29]

> The treaty and implementing memorandum of understanding foster competition between U.S. and Icelandic flag carriers for 100 percent of the cargo transported by sea between Iceland and the United States for purposes of the 1951 Defense Agreement between the two countries. The overall low bidder is awarded 65 percent of the cargo and the low bidder of the other country is awarded the remaining 35 percent. This is how the existing contracts were awarded.

Thus, the Secretary concluded that the MOU requires a single competition in which the contestants bid for 100% of the cargo, and that the "overall low bidder" wins a contract to carry 65% of the cargo, while the "remaining 35 percent" goes to the low bidder from the other country— precisely as Rainbow asserts. Any still

remaining doubt is allayed by the Secretary's reference to a continuation of the method by which the existing contracts were awarded. Those (1987) contracts were, of course, awarded precisely on the basis of the interpretation of the MOU urged upon the Court by Rainbow.

### V

Rainbow and its seamen have an extremely strong likelihood of success on the merits. These parties also stand to be irreparably harmed if the procurement is not enjoined. As concerns Rainbow, its business would in all likelihood have to be shut down; as regards the Union, its members employed by Rainbow will lose their jobs. Indeed, the Court is persuaded, on the basis of the evidence before it, that Rainbow cannot secure alternate shipping business and that, in view of the depressed nature of the American merchant marine, its seamen are unlikely to find new employment.

By issuing a preliminary injunction, the Court preserves the status quo between the parties.[30] And, in view of the existence of present arrangements, there will be no interruption of the delivery of the cargo and thus no injury to the public interest or to the defendants.

### VI

As indicated, the recent events connected with implementation of the treaty represent the third time that the Navy has attempted to eliminate Rainbow, a small American-flag shipper, from the Icelandic trade. In 1985, the Navy announced and assured the Court that Rainbow had to be disqualified from a cargo preference because its rates were excessive. Upon examination, it was found that this was untrue and that the real reason for the attempted disqualification was the Department of State's plan to permit Icelandic

---

**28.** Rainbow claims that, for a variety of reasons, it will not be able to compete effectively under the Navy's two-competition system, and the Court is persuaded on the basis of the evidence available at this juncture, that this representation is correct.

**29.** Secretary Carlucci's letter was attached to the Union's motion for preliminary injunction.

**30.** Rainbow will continue to carry its share of the cargo under the 1987 procurement, and so will Eimskip, the Icelandic carrier. The Court takes no position on the issue of how Eimskip should be paid for transporting its 65% of the cargo during the period of this injunction. That is a matter for resolution between the Navy and Eimskip.

shippers to regain their monopoly with respect to that trade. In 1986, the Navy assured the Court that Rainbow's services could be dispensed with because military aircraft which were flying by way of Iceland anyway could perform Rainbow's role. Upon inquiry, it became apparent that, contrary to the Navy's assurances and contrary to binding regulations, military aircraft were capable of taking on that role only if they were diverted from their normal duties.

Now the Navy is attempting to eliminate Rainbow once again, this time under the treaty with Iceland. The present effort is as disingenuous as the other two. The construction of the memorandum of understanding adopted by the Navy is contrary to the ordinary meaning of the language contained in that document. It is contrary also to the assurances given by Mr. Derwinski and Rear Admiral Piotti, Jr., to the Senate Committee on Foreign Relations when the treaty was before that committee for ratification. And it is contrary, finally, to an interpretation of the treaty announced just two months ago by Secretary of Defense Carlucci himself.

The Court understands that Iceland is a staunch ally of the United States, and it sympathizes with the efforts of our government to satisfy the demands of that nation. But this may not be done at the expense of one of the few remaining American-flag vessels of our merchant marine and the few remaining American seamen who have found employment there. More particularly, this may not be done in violation of American law, of the language and purpose of a treaty, and of the solemn representations made to the United States Senate in connection with the ratification of that treaty.

The Court has accordingly, once again, enjoined the Navy's attempt to put Rainbow out of business.