RAINBOW NAVIGATION, INC., et al.

v.

DEPARTMENT OF the NAVY, et
al., Appellants.

RAINBOW NAVIGATION, INC., et al.

v.

DEPARTMENT OF the NAVY, et
al., Appellants.

Nos. 85–6046, 85–6104.

United States Court of Appeals, District
of Columbia Circuit.

Argued Dec. 11, 1985.

Decided Jan. 27, 1986.

As Amended Feb. 14, 1986.

States vessel is "excessive or otherwise unreasonable," thereby triggering a proviso of the Act which authorizes the acceptance of competitive bids from foreign-flag vessels, 10 U.S.C. § 2631 (1982). This suit brings into question the nature of the factual finding required by the proviso, the reviewability of that finding, and the rationality of the finding in this case.

Peter R. Maier, Atty. Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on brief, for appellants. Glen L. Archer, Jr. and Michael L. Paup, Attys. Dept. of Justice, also entered appearances for appellants.

Frank J. Costello, with whom John W. McConnell, Jr. was on brief, for appellee Rainbow Navigation, Inc.

Benjamin L. Zelenko, with whom Martin Shulman and Ellen Godbey Carson were on brief, for appellee Intern. Organization of Masters, Mates & Pilots.

Before SCALIA and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

SCALIA, Circuit Judge:

In this case, the government has invoked a hitherto unused provision of the Cargo Preference Act of 1904 to revoke the shipping preference presently enjoyed by Rainbow Navigation, Inc., as the only U.S.-flag ship serving the military cargo route from the United States to the United States military base at Keflavik, Iceland. Faced with repeated complaints from Icelandic officials over the exclusion of Icelandic carriers, apparently escalating to a threatened withdrawal of permission to use the Keflavik base, the government has made a finding that the "freight charged" by the United

I

The Cargo Preference Act of 1904, ch. 1766, 33 Stat. 518 (codified as amended at 10 U.S.C. § 2631 (1982)), is part of the congressionally prescribed subsidy for the United States commercial shipping industry. In addition to direct subsidization of the construction costs, see Merchant Marine Act of 1936, ch. 858, Title V, 49 Stat. 1995 (codified as amended at 46 U.S.C. §§ 1151–1161 (1982)), and operating costs, see id., Title VI, 49 Stat. 2001 (codified as amended at 46 U.S.C. §§ 1171–1185 (1982)), of United States vessels which seek to operate in foreign-trade markets, indirect subsidies are provided in the form of a preference for United States commercial vessels over lower-bidding foreign vessels on certain routes (notably, all routes between points in the United States, see Merchant Marine Act of 1920, ch. 250, § 27, 41 Stat. 988, 999 (codified as amended at 46 U.S.C. § 883 (1982))), and for the carriage of certain cargoes. The latter "preference cargoes" include fifty percent (by gross tonnage) of all government supplies which require foreign shipment by sea, see 46 U.S.C. § 1241(b) (1982) (added to the Merchant Marine Act of 1936, ch. 858, Title IX, § 901, 49 Stat. 2015, by the Cargo Preference Act of 1954, 68 Stat. 832), and, what is involved in the present case, one hundred percent of all military supplies transported by ship abroad. See generally Aeron Marine Shipping Co. v. United States, 695 F.2d 567, 569–70 (D.C.Cir.1982); Independent U.S. Tanker Owners Committee v. Lewis, 690 F.2d 908, 911–12 (D.C.Cir.1982).

The statutory provision at issue here, originating in the Cargo Preference Act of 1904, reads as follows:

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law.

10 U.S.C. § 2631. Despite its categorical language, this provision has been interpreted to be inapplicable when no U.S.-flag ships are "available" to carry the cargo, *see* *Curran v. Laird*, 420 F.2d 122, 127–28, 133 (D.C.Cir.1969). When the preference is overridden by a presidential finding under the Act (an event which has, as we have said, never before occurred), the procedures "otherwise provided by law" consist of competitive closed-bid or informal negotiation procedures open to foreign- as well as U.S.-flag ships. *See* Armed Services Procurement Act of 1947, ch. 65, 62 Stat. 21 (1948) (as amended and codified at 10 U.S.C. §§ 2301–2316 (1982)).

From the late 1960s until May 1984, there were no U.S.-flag ships available to serve the route between the United States and the American military base at Keflavik and so the preference did not come into play. Military cargo was carried exclusively by Icelandic ships, which at no time numbered more than three ships serving the route, all of which charged the same rates. In May 1984, Rainbow Navigation, Inc., a United States company created to serve this sole route, began operating the M/V Rainbow Hope, a small vessel leased from the Department of Transportation, filing with the Federal Maritime Commission rates identical to those charged by the Icelandic companies. Because of the preference for United States vessels, Rainbow immediately commenced to carry most of the military cargo, operating under bills of lading issued by the Military Sealift Command. The Icelandic shipping companies were of course upset by their exclusion from this trade, and made their dissatisfaction known to the Government of Iceland. That Government, in turn, remonstrated with the United States Department of State, raising the matter at least six times in 1985. According to a Declaration by Secretary of State Shultz filed with the court, the problem became a "source of significant friction" in United States-Icelandic relations, creating Administration fears of "unilateral retaliatory action by the Government of Iceland, affecting military facilities in Iceland upon which we depend." Declaration of Secretary of State Shultz at 2–3.

The State Department sought relief on several fronts, including an unsuccessful attempt to amend the 1904 Act, and a rebuffed proposal to compensate Icelandic shipping firms for loss of the route. Finally, the government took the action which forms the basis of this challenge. On August 8, 1985, without notice to Rainbow, much less any hearing at which it could present objections, the Secretary of the Navy issued a short statement containing his finding, based on "all relevant circumstances, including consultation with the Secretary of State," that "the rates currently being paid are excessive and are also otherwise unreasonable," thereby invoking the exception to the preference provision. The Military Sealift Command simultaneously issued a solicitation for bids for the carriage of military cargo on the United States-Iceland route. Four days later, Rainbow filed suit in the United States District Court for the District of Columbia against the Department of the Navy and various other federal agencies, and against the Secretary of the Navy and various other government officials in their personal capacities, seeking declaratory and injunctive relief and (from the individual defendants only) monetary damages. The International Organization of Masters, Mates & Pilots ("International"), the collective bargaining representative of the seamen on the M/V Rainbow Hope, intervened as a plaintiff. Rainbow initially moved for a temporary restraining order, but withdrew the motion in exchange for the government's agreement to maintain the status quo and to notify Rainbow before making

any awards on the route. Rainbow moved for partial summary judgment on its declaratory and injunctive claims.

Before argument on that motion was heard, the government sought to cure several of the alleged procedural defects that had been challenged by Rainbow. After sending for publication in the Federal Register a delegation of authority from the President to the Secretary of the Navy to make the "excessive or otherwise unreasonable" finding, see 3 U.S.C. § 301 (1982), and after publishing commercial notices of the solicitation, on September 6 the Secretary of the Navy issued a new announcement, essentially identical to the first except for the addition of a citation to an August 30, 1985 memorandum from the Assistant Secretary of the Navy for Shipbuilding and Logistics and an explicit order to the Assistant Secretary to procure transportation service "under principles of full and open competition." The key finding, again, was that "under the existing tariff filed by the United States flag carrier on that route, the rates currently charged by Rainbow Navigation, Inc., are excessive and are also otherwise unreasonable." Shortly thereafter the Military Sealift Command issued a new solicitation for bids. This second announcement and solicitation became the focus of the District Court's review.[1]

On October 15, the District Court issued its order, granting Rainbow's requests for declaratory and injunctive relief. The court ordered the government to withdraw the solicitation for bids and restrained it from making any finding that Rainbow's rates are "excessive or otherwise unreasonable," except in accordance with the court's interpretation of the Act, contained in its memorandum opinion issued on October 23. The court's reasoning was, in brief, (1) that the Secretary's determination was reviewable, (2) that the statutory proviso requires the government to make an economic determination that the U.S.-flag ship is making

"more than a fair profit" before the preference may be revoked, (3) that on the record in this case such a finding had no rational basis, and (4) that in addition the Secretary's decision was vitiated by his reliance upon "foreign policy, political, or geopolitical grounds." *Rainbow Navigation, Inc. v. Dep't of the Navy*, 620 F.Supp. 534, 540, 541 (D.D.C.1985) ("Mem. op."). Simultaneously with the issuance of its opinion, the court rejected the government's motion for a stay of its mandate but modified its injunction to allow the government to solicit bids for the route but not to make any awards. *Rainbow Navigation, Inc. v. Dep't of the Navy*, Civ. No. 85–2560, slip op. at 5–6 (D.D.C. Oct. 23, 1985) (Order). On appeal, a motions panel of this court denied the government's request for a stay of the District Court's order, but granted its motion for expedited hearing. The case is before us pursuant to 28 U.S.C. § 1292 (1982).

## II

The issue of the reviewability of the Secretary's determination turns upon the factors which the "excessive or otherwise unreasonable" proviso permits the Secretary to consider. If, as the government asserts, the finding that rates are "excessive or otherwise unreasonable," 10 U.S.C. § 2631, can be based upon foreign policy or military grounds, it is highly likely that the matter would be deemed committed to Executive discretion, 5 U.S.C. § 701(a)(2) (1982), and that judicial review would be barred. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111–112, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). We confess to be perplexed as to the government's theory on this interpretive point. The government's brief begins its substantive analysis as follows:

> The Act contemplates two situations in which the President or his delegate may decide that preference for U.S. ships need not be applied. The first situation

---

1. Rainbow challenged some procedural aspects of the Secretary's second decision before the District Court, including the propriety of the

delegation. That court found it unnecessary to reach those issues, as do we.

occurs when the freight charged is "excessive." ....

The second situation arises when the freight charged is "otherwise unreasonable," a term that the statute leaves undefined. The Act thereby gives the President an extra measure of discretion: even if the rates are not "excessive," he may suspend the preference where the rates would be "unreasonable" in some other respect. By including "otherwise unreasonable" as a distinct ground for suspension, the statute permits the President to consider other factors and reserves to him the decision as to what other factors are relevant.

Brief for Appellant at 19–20. One would normally understand this to mean that the President may, if he chooses, use noneconomic "other" factors (*e.g.*, foreign relations) as the sole basis for his decision. Later, however, the government executes the following about-face:

The Government has never contended that the Act empowers the President to determine that rates are "excessive or otherwise unreasonable" without any economic predicate. Its position is that the President may take into account noneconomic considerations along with economic factors. The district court's opinion suggests that it may have misunderstood the Government's argument.

*Id.* at 37 n. 26. If "otherwise unreasonable" is, as the government originally asserts, *alternative* to "excessive," a "distinct ground for suspension" that includes "other factors" than economic ones, then one wonders why there need be *any* economic content to the "otherwise unreasonable" determination. Perhaps the concession that it must contain some economic content is prompted by the embarrassing reality that what the statute requires to be "otherwise unreasonable" is not the mere fact of compulsory carriage by American ships, but rather "the freight charged by those vessels." It is impossible to imagine how "freight charged" can be unreasonable except in an economic sense. But that leads to the conclusion, not that there must be *some* "economic predicate" to the "otherwise unreasonable" determination, but rather that the *entirety* of that determination must be economic—*i.e.*, must pertain to the character (the necessarily economic character) of the freight charges. Thus, it might be reasonable to read "excessive" to mean "affording more than a reasonable profit," and "or otherwise unreasonable" to mean "despite the reasonableness of the profit, inordinately in excess of what foreign shippers would charge." But the finding—whether of "excessiveness" or of "other unreasonableness"—must unquestionably be directed to the *rates*. We see no room in the statutory phrase for general foreign policy or military considerations, such as Iceland's desire to have her own ships carry the cargo and her threatened closure of our military base.

The point is in fact even clearer than the wording of the present statute suggests. The language appearing in the current United States Code was adopted in 1956, as part of the codification of Title 10. The statute effecting that codification provided that "it is the legislative purpose to restate, without substantive change, the law replaced by [the codification] on the effective date of this Act." 70A Stat. 640, § 49(a) (1956). Even without such specification, it is well established that language revisions in codifications will not be deemed to alter the meaning of the original statute. *See Muniz v. Hoffman*, 422 U.S. 454, 467–74, 95 S.Ct. 2178, 2186–89, 45 L.Ed.2d 319 (1975); 1A SUTHERLAND STATUTORY CONSTRUCTION § 28.10 & cases listed in n. 1 (Sands 4th ed. 1985). Here the original language adopted in 1904 was quite different. Specifically, so far as is relevant here, the criterion for presidential disregard of the American-bottom requirement was not "that the freight charged by those vessels is *excessive or otherwise unreasonable*," 10 U.S.C. § 2631 (emphasis added), but rather "that the rates of freight charges by said vessels are *excessive and unreasonable*," ch. 1766, 33 Stat. 518, 519 (1904)

(emphasis added).[2] It does not seem to us, in fact, that the codified language is a faithful recasting of the original (since we tend to be particular about the difference between "and" and "or"). But the original language makes even plainer than the codification that *economic* excessiveness or unreasonableness is the criterion.

This is also clear from the legislative history, which happens to be unusually reliable in the present case, since the language at issue was actually crafted on the floor of the Senate in the course of lengthy debate over three days, occupying some 46 pages of the Congressional Record. The provision originally proposed by Senator Hale, floor manager of the bill, was as follows:

> That the President of the United States may from time to time suspend, in whole or in part, section 1 of this act whenever, in the interests of the national defense or for the protection of the interests of the Government, such suspension may seem to him desirable.

38 CONG.REC. 2408 (1904). That was altered to the ultimately adopted form ("unless the President shall find that the rates of freight charges by said vessels are excessive and unreasonable") in response to the objection that the original language would be an unconstitutional delegation of legislative authority, running afoul of the Supreme Court's decision in *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892). 38 CONG.REC. 2474–77 (1904); *see also id.* at 2417–18, 2593–94. The principal proponent of the change, Senator Bacon, insisted that the presidential finding

> must be something specific. It can not be put simply upon the ground of the judgment of the President as to the inter-

est of the United States. There must be some specific fact found.

*Id.* at 2475. It is clear throughout the lengthy Senate debate, moreover, that the "fact found" was to be a purely economic one. Out of many examples, the following exchange between Senators Hale and Patterson will suffice:

> Mr. PATTERSON. ... Suppose an emergency requires the Government to charter foreign vessels for the removal of troops, why should not the Government in a case of that kind be permitted to carry on such vessels supplies for the Army?
>
> Mr. HALE. That is all covered by the proviso. If in an emergency the President finds there are not enough vessels bid at a reasonable rate for the carrying of all the freight he wants, then he acts under the provisions of existing law. If he finds enough to do the business at reasonable rates, then he must take American ships....
>
> Mr. PATTERSON. ... Why should not section 2, as reported from the committee, continue to be a part of the bill?
>
> Mr. HALE. Senators objected to that because it was transferring the lawmaking power to the President, and we substituted this provision.
>
> Mr. PATTERSON. I recall that ground. Yet the section might be modified so as to evade that objection.
>
> Mr. HALE. I am entirely certain that the point of any practical difficulty arising is covered by this proviso. If the President finds for any reason that he can not get the transportation needed at reasonable prices in American vessels, then he falls back upon existing law and has to charter foreign vessels.

---

**2.** Counsel for Rainbow and for the government were apparently unaware of this basic fact: "Senator Bacon ... suggested 'excessive or otherwise unreasonable' as the standard ... and that language was adopted by the Senate and carried over into the 1904 Act." Brief for Appellee Rainbow at 20. "Congress found these types of limitations [suggested in the 1904 debate] too restrictive and rejected them in favor of language giving the President a broad discretion to determine whether rates are 'excessive or other-

wise unreasonable.'" Brief for Appellants at 24–25. Counsel for International discovered that the 1904 text was different from the current version, but got the text wrong: "After further discussion, Senator Bacon suggested 'excessive or unreasonable' freight rates as the sole exception the preference [*sic*], ... and that was the language adopted into law." Brief for Appellee International at 11. The court has a right to expect more careful assistance from counsel.

*Id.* at 2595. We resist the temptation to quote at greater length from a legislative history that uniformly conveys this same message: The "practical difficulty" at which this provision was directed was not the preference's possible impairment of foreign policy but its possible compulsion of payment of economically "excessive" rates. That was the plain understanding of Attorney General Bonaparte, who provided advice to the Secretary of the Navy regarding implementation of the Act three years after its passage. *See* 26 Op.Att'y Gen. 415, 418–19 (1907).

It may well be that the President has certain constitutionally conferred powers as commander-in-chief that this essentially domestic statute, intended to subsidize the United States merchant marine, was not meant to, or could not constitutionally, displace. We doubt, for example, whether a decision that the Navy should use a foreign ship, faster or less vulnerable than any American ship available, to deliver urgently needed supplies to troops in wartime would (even if it did not fall within the proviso at issue here) be prohibited. We need not decide, however, whether the statute is subject to an implied exception in deference to such presidential powers, enabling foreign ships to be used when the Executive concludes that military-foreign policy considerations so require. The Secretary of the Navy did not assert the exercise of any independent presidential authority here, but relied exclusively upon the "excessive or otherwise unreasonable" proviso. *See SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

██ Before proceeding to inquire whether the economic finding required by the statute is reviewable, we consider a preliminary question which, if answered adversely to the government as it was by the District Court, will render further inquiry unnecessary: whether reliance upon noneconomic (military and foreign affairs) factors automatically vitiates the Secretary's action. The answer turns upon whether the Secretary's action was based independently upon "economically excessive" grounds, regardless of whether military or foreign policy motives prompted his action as well. The Executive frequently acts out of multiple concerns, though only one of them is sufficient in law to support the action in question. At least where those other concerns are, though insufficient, lawful (as solicitude for our continuing ability to use Keflavik assuredly is), they do not invalidate the action. *See, e.g., American Federation of Government Employees v. Carmen,* 669 F.2d 815, 821 (D.C.Cir.1981). In the present case, it is not entirely clear whether the "economically excessive" ground was an independent basis for the action, accompanied by military and foreign policy concerns, or whether the latter concerns were an inseparable part of the "excessiveness" determination. The Secretary received separate documentation of economic excessiveness, and phrased his finding as a statement that the rates "are excessive *and are also* otherwise unreasonable" (emphasis added). On the other hand, the government's argument, described above, that the Secretary was entitled to "take into account noneconomic considerations along with economic factors," Brief for Appellant at 37 n. 26, suggests a combined rather than independent determination; and counsel for the government acknowledged at oral argument that the military and foreign affairs determination was not an independent ground. Because the nature of the Secretary's finding is in this respect not entirely clear, and because there are other reasons why reversal of his action is in any event necessary, we pass this point, and assume that the Secretary made an independent economic determination.

### III

That brings us to the question whether the economic determination is judicially reviewable. The government asserts that it is not, since it comes within the scope of that provision of the Administrative Procedure Act which exempts from judicial scrutiny "agency action ... committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

The operation of this provision has been described by the Supreme Court as follows:

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

*Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

■ The District Court rejected the government's argument by a perplexing footnote citation to *Curran v. Laird,* 620 F.Supp. at 538 n. 14, a case in which the court found the determination of the availability of American ships to be *un*reviewable. Whether or not that case supports the District Court's finding of reviewability, however, the same conclusion would have followed inevitably from the District Court's judgment that the Cargo Preference Act of 1904 guarantees "that U.S. vessels would receive a preference at renumerative [*sic*] rates, and that U.S. ship owners are at a minimum entitled to a 'fair profit.'" 620 F.Supp. at 539. The requirement of a "fair profit" hardly provides "no meaningful standard against which to judge the agency's exercise of discretion"; to the contrary, it is a standard courts traditionally use in reviewing rate regulation.

As an original matter, it is far from clear that "fair profit" is the criterion that the Act establishes. The phrase "excessive or otherwise unreasonable" (or, in its original version, "excessive and unreasonable") would naturally be interpreted to refer only to excessive profits if it were applied to the rates of a monopolist in traditional public utility regulation. The very premise of such regulation is that a monopolist can provide the cheapest service—so that establishing a state-protected monopoly and restricting the monopolist to a "fair profit" automatically guarantees the consumer the lowest price. The 1904 Cargo Preference Act, by contrast, starts from the premise that lower prices can be obtained from foreign-flag ships; it purposefully forgoes that benefit in order to strengthen the nation's merchant marine. In that quite different context, the consumer must be concerned not only with excessive profits for United States lines but also with excessive cost (*i.e.,* cost beyond the economic penalty normally incurred by excluding foreign competition) resulting from the mandatory use of United States lines in exceptionally inefficient circumstances. Assume, for example, a small island-state, far removed from normal shipping lanes and therefore visited only by its own small ships. It is hard to believe that Congress did not intend the "excessive and unreasonable" language to cover a demand by a United States shipping company to carry provisions for a military base on that island, where such carriage would entail a special trip with only ten percent of the cargo hold filled and a return voyage with no cargo at all—so long as the profit earned from this wasteful voyage was not excessive. The cost to the United States would be excessive and unreasonable and that, we think, would suffice.[3]

■ The legislative history of the proviso supports the view that excessive cost as well as excessive profit may be the basis for the finding. The belief of the floor manager of the bill that the proviso (in essentially its present language) was "only another form" of the original provision that it replaced, 38 Cong.Rec. 2476 (1904), which authorized the President to suspend the American-bottoms requirement "whenever,

---

**3.** In this respect the 1904 Act differs significantly from the Cargo Preference Act of 1954, which establishes a U.S.-flag preference for *non*military government cargoes. In the latter, extraordinarily inefficient carriage can readily be avoided, since the preference need only be extended to fifty percent of government supplies. It is noteworthy that this later statute requires a prior finding that preference cargo rates are "fair and reasonable ... for United States-flag commercial vessels," 46 U.S.C. § 1241(b)—a mechanism and terminology much more reminiscent of traditional "fair profit" utility ratemaking than is the "excessive or otherwise unreasonable" proviso in the codification of the 1904 Act.

in the interests of the national defense, or for the protection of the interests of the Government, such suspension may seem to him desirable," *id.* at 2408, suggests the broadest possible meaning of the term "excessive rates." The same conclusion emerges from the rest of the legislative history, which is replete with concern, which this proviso was proffered to assuage, over the open-endedness of the charges upon the Treasury. The principal amendments unsuccessfully offered by opponents of the bill sought not to limit the rate of profit a United States shipping company could make, but rather the rate of *expenditure* by the United States above the freight charges available from foreign shipping companies, with amendments limiting the preference to freight charges no more than ten, fifteen, twenty, twenty-five, fifty, and one-hundred percent above the rates available from foreign shipping companies successively rejected. *Id.* at 2418–19, 2458, 2462, 2596. Senator Hale's response to such proposals was that he "[did] not know what the percentage ought to be, and [was] entirely willing to leave that to the executive officers when the emergency arises." *Id.* at 2417.

 If this interpretation of the proviso were available—an interpretation that in effect leaves it to the President to decide, in light of the financial needs of the government and of the merchant marine, when the subsidization of a particular route is simply *too* expensive—we would be inclined to agree with the government that there is "no meaningful standard" for judicial review. The problem is that the Executive has not chosen to interpret the law in this fashion. The Federal Acquisition Regulations governing Ocean Transportation by U.S.-Flag Vessels, 48 C.F.R. Subpart 47.5 (1984), effective since April 1, 1984, 48 Fed.Reg. 42,102, 42,442–43 (1983), treat the preference under the Cargo Preference Act of 1904 as if it were exactly the same as the preference under the Cargo Preference Act of 1954, 46 U.S.C. § 1241(b), which concededly establishes a "reasonable profit" criterion. *See, e.g., American Maritime Association v. United States,* 766

F.2d 545, 549 (D.C.Cir.1985) (citing *Payment of Subsidy for Carriage of Preference Cargoes,* 13 SHIP.REG.REP. (P & F) 44 (M.S.B.1972)). The regulations do not refer to "excessive or otherwise unreasonable" rates, but to "fair and reasonable" rates, 48 C.F.R. § 47.502(a)(1)—classic cost-of-service ratemaking terminology, and the same terminology used for the 1954 Act, *see* 48 C.F.R. § 47.502(a)(3). Even more conclusively, the regulations describe the 1904 Act as applicable when U.S.-flag vessels "are available at rates that are fair and reasonable *for U.S.-flag commercial vessels,*" 48 C.F.R. § 47.503(b) (emphasis added), and the same language is used in the Department of Defense's supplementary regulations governing ocean transportation of the Department's supplies, 48 C.F.R. § 247.503(S–71)(3). The emphasized phrase is utterly incompatible with any interpretation other than one that views the proviso here at issue as going to reasonable profit. Even if the interpretation of the 1904 Act contained in the current regulations is not a permissible one (and perhaps it is), so long as that error of law does not harm any private party the government may not normally depart from it in an adjudicatory proceeding, as it has here, without first amending the regulations. *American Federation of Government Employees, Local 3090 v. FLRA,* 777 F.2d 751, 760 (D.C.Cir. 1985) (Scalia, J., concurring). Based on the regulatory framework which the Executive branch has created to implement the 1904 Act, we find that there is a "meaningful standard," *Heckler v. Chaney,* 105 S.Ct. at 1655—the standard of reasonable profit, *American Maritime Association,* 766 F.2d at 549—that we can and must apply to review the Secretary's action.

### IV

 We therefore examine the Secretary's decision to ensure that the agency has "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers*

*Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). We agree with the District Court that it has not. The evidence before the Secretary consisted of essentially three pieces of information. First, a comparison of Rainbow's per-container price on the United States-Iceland route with the prices reached through competitive bidding among United States carriers on other military cargo routes revealed that Rainbow's rates were significantly higher. Higher prices, however, do not establish excessive profits absent a showing that the costs of service on the compared routes are equivalent. Second, the rates charged by Rainbow are the same as those previously charged by the Icelandic vessels that handled the traffic—which earlier rates are asserted by the government to have been "monopolistic." Absent any factual basis for that assertion, the datum proves nothing. Indeed, it tends to show that Rainbow's profit is *not* excessive, since its rates are competitive with those of normally lower-cost foreign carriers. Finally, the Secretary had before him the Assistant Secretary of the Navy's statement that "[a]nalysis indicates that profitable operations can be achieved with rates about 60% of the current level." Once again, factual basis for this assertion is utterly lacking.

None of this evidence is sufficient to support a conclusion that Rainbow is making more than a reasonable profit. The Secretary's finding and the action based upon it must therefore be set aside. 5 U.S.C. § 706(2)(A).

 * * * * * *

The manner of the Navy's action in this case was extraordinary, giving Rainbow no opportunity to examine and, if possible, correct the factual finding of "excessive or otherwise unreasonable" rates on which termination of its preference was based. Perhaps the Secretary would have proceeded differently if he had not been relying primarily upon the military and foreign policy considerations which he thought could justify his finding under the "excessive or otherwise unreasonable" proviso, and which in his view would overcome whatever economic showing Rainbow might have made. In any case, because we find that the Secretary's decision cannot be upheld on substantive grounds, like the District Court we have found it unnecessary to address procedural objections, which might exist even if the substance of the economic determination were unreviewable.

The judgment of the District Court is *Affirmed.*

STARR, Circuit Judge, concurring:

I concur fully in Judge Scalia's opinion for the court. I write separately to emphasize what I view as the narrowness of today's holding. We have before us an executive decision based expressly on economic considerations which, as Judge Scalia's analysis convincingly shows, is amendable to judicial review and which will not withstand the rather modest scrutiny mandated by the APA. We have not been asked to review an executive decision explicitly grounded on military and foreign policy concerns, a decision which would present us with a different case. The legislative history of the statute suggests to me that Congress did not intend, by including the narrow, cost-related proviso, to preclude the President from employing non-U.S. vessels for supplying military cargo (regardless of the rates charged by U.S. vessels) if he determines that military and foreign policy considerations so require. Indeed, to construe the statute otherwise would raise the question of whether the statute invades core Presidential powers under Article II of the Constitution.

But that problem is not before us. We have a specific decision grounded expressly on economic considerations, nothing more. A passing reference to "consultations with the Secretary of State" cannot reasonably be taken to mean that the *decisionmaker* was relying on foreign policy and military considerations. That the decision was

based on an economic analysis is further suggested by the Government's litigating position, namely that the statute *requires* economic-based consideration and justification—even when our bases in Iceland are said to be threatened. It strikes me as passing strange that Congress would demand, at the peril of losing vital military bases overseas, that the Commander-in-Chief employ U.S. shipping companies to transport military supplies so long as those companies are not exacting excessive and unreasonable rates. That defies common sense. I doubt whether the Congress in 1904 was so protectionist in sentiment that it intended to bind the President in such a Procrustean manner.