# Authority to Issue Executive Order on Government Procurement

The Federal Property and Administrative Services Act vests the President with authority to issue Executive Order No. 12954, entitled "Ensuring the Economical and Efficient Administration and Completion of Federal Government Contracts," in light of his finding that it will promote economy and efficiency in government procurement.

March 9, 1995

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

On March 6, 1995, we issued a memorandum approving as to form and legality a proposed executive order entitled, "Ensuring the Economical and Efficient Administration and Completion of Federal Government Contracts." On March 8, 1995 the President signed the proposed directive, making it Executive Order No. 12954. This memorandum records the basis for our prior conclusion that the Federal Property and Administrative Services Act vests the President with authority to issue Executive Order No. 12954 in light of his finding that it will promote economy and efficiency in government procurement.

## I.

Executive Order No. 12954 establishes a mechanism designed to ensure economy and efficiency in government procurement involving contractors that permanently replace lawfully striking workers. After a preamble that makes and discusses various findings and ultimately concludes that Executive Order No. 12954 will promote economy and efficiency in government procurement, the order declares that "[i]t is the policy of the Executive branch in procuring goods and services that, to ensure the economical and efficient administration and completion of Federal Government contracts, contracting agencies shall not contract with employers that permanently replace lawfully striking employees." Exec. Order No. 12954, § 1. The order makes the Secretary of Labor ("Secretary") responsible for its enforcement. *Id.* § 6. Specifically, the Secretary is authorized to investigate and hold hearings to determine whether "an organizational unit of a federal contractor" has permanently replaced lawfully striking employees either on the Secretary's own initiative or upon receiving "complaints by employees" that allege such permanent replacement. *Id.* § 2.

If the Secretary determines that a contractor has permanently replaced lawfully striking employees, the Secretary is directed to exercise either or both of two options. First, the Secretary may make a finding that all contracts between the government and that contractor should be terminated for convenience. *Id.* § 3. The Secretary's decision whether to issue such a finding is to be exercised to advance

the government's economy and efficiency interests as set forth in section 1. *Id.* § 1 ("All discretion under this Executive order shall be exercised consistent with this policy."). The Secretary is then to transmit the finding to the heads of all departments and agencies that have contracts with the contractor.[1] Each such agency head is to terminate any contracts that the Secretary has designated for termination, unless the agency head formally and in writing objects to the Secretary's finding. *Id.* § 3. An agency head's discretion to object is also limited to promoting the purpose of economy and efficiency as set forth in the policy articulated in section 1.

The Secretary's second option is debarment. If the Secretary determines that a contractor has permanently replaced lawfully striking employees, the Secretary is to place the contractor on the debarment list until the labor dispute has been resolved, unless the Secretary determines that debarment would impede economy and efficiency in procurement. The effect of this action is that no agency head may enter into a contract with a contractor on the debarment list unless the agency head finds compelling reasons for doing so. *Id.* § 4.

Executive Order No. 12954, taken as a whole, sets forth a mechanism that closely ties its operative procedures — termination and debarment — to the pursuit of economy and efficiency. The President has made a finding that, as a general matter, economy and efficiency in procurement are advanced by contracting with employers that do not permanently replace lawfully striking employees. Additionally, the President has provided for a case-by-case determination that his finding is justified on the peculiar facts and circumstances of each specific case before any action to effectuate the President's finding is undertaken.

## II.

The Supreme Court has instructed that "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The President's authority to issue Executive Order No. 12954 is statutory; specifically, the Federal Property and Administrative Services Act of 1949 ("FPASA"). That statute was enacted "to provide for the Government an economical and efficient system for . . . procurement and supply." 40 U.S.C. § 471. The FPASA expressly grants the President authority to effectuate this purpose,

> The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator [of General Services] and

---

[1] We will refer to this class of officials generically as agency head(s).

executive agencies in carrying out their respective functions here-
under.

*Id.* § 486(a). An executive order issued pursuant to this authorization is valid if
(a) "the President acted 'to effectuate the provisions' of the FPASA," and (b)
the President's "action was 'not inconsistent with' any specific provision of the
Act." *American Fed'n of Gov't Employees v. Carmen,* 669 F.2d 815, 820 (D.C.
Cir. 1981) (quoting 40 U.S.C. § 486(a)). We are not aware of any specific provi-
sion of the FPASA that is inconsistent with Executive Order No. 12954. Therefore,
we turn to the question whether the President acted to effectuate the purposes
of the FPASA.

Every court to consider the question has concluded that § 486(a) grants the
President a broad scope of authority. In the leading case on the subject, the United
States Court of Appeals for the District of Columbia Circuit, sitting en banc,
addressed the question of the scope of the President's authority under the FPASA,
and § 486(a) in particular. *See AFL–CIO v. Kahn,* 618 F.2d 784 (D.C. Cir.) (en
banc), *cert. denied,* 443 U.S. 915 (1979). A plausible argument that the FPASA
granted the President only narrowly limited authority was advanced and rejected.
*See id.* at 799–800 (MacKinnon, J., dissenting). After an extensive review of the
legislative history of that provision, the court held that the FPASA, through
§ 486(a), was intended to give the President "broad-ranging authority" to issue
orders designed to promote "economy" and "efficiency" in government procure-
ment. *Id.* at 787–89. The court emphasized that " '[e]conomy' and 'efficiency'
are not narrow terms; they encompass those factors like price, quality, suitability,
and availability of goods or services that are involved in all acquisition decisions."
*Id.* at 789; *see also* Peter E. Quint, *The Separation of Powers under Carter,* 62
Tex. L. Rev. 785, 792–93 (1984) (although § 486(a) "easily could be read as
authorizing the President to do little more than issue relatively modest house-
keeping regulations relating to procurement practice. . . . The *Kahn* court found
congressional authorization of sweeping presidential power . . . ."); Peter Raven-
Hansen, *Making Agencies Follow Orders: Judicial Review of Agency Violations
of Executive Order 12,291,* 1983 Duke L.J. 285, 333 n.266; Jody S. Fink, *Notes
on Presidential Foreign Policy Powers (Part II),* 11 Hofstra L. Rev. 773, 790–
91 n.132 (1983) (characterizing *Kahn* as reading § 486(a) to grant President "vir-
tually unlimited" authority).

The court then concluded that a presidential directive issued pursuant to § 486(a)
is authorized as long as there is a "sufficiently close nexus" between the order
and the criteria of economy and efficiency. *Kahn,* 618 F.2d at 792. Although the
opinion does not include a definitive statement of what constitutes such a nexus,
the best reading is that a sufficiently close nexus exists when the President's order
is "reasonably related" to the ends of economy and efficiency. *See id.* at 793
n.49; Harold H. Bruff, *Judicial Review and the President's Statutory Powers,* 68

Va. L. Rev. 1, 51 (1982) ("in *AFL–CIO v. Kahn*, the court stated an appropriate standard for reviewing the basis of a presidential action — that it be 'reasonably related' to statutory policies") (footnote omitted).

As one commentator has asserted, under *Kahn*, the President need not demonstrate that an order "would infallibly promote efficiency, merely that it [is] plausible to suppose this." Alan Hyde, *Beyond Collective Bargaining: The Politicization of Labor Relations under Government Contract*, 1982 Wis. L. Rev. 1, 26. In our view a more exacting standard would invade the "broad-ranging" authority that the court held the statute was intended to confer upon the President. *See Kahn*, 618 F.2d at 787–89. In addition, a stricter standard would undermine the great deference that is due presidential factual and policy determinations that Congress has vested in the President. *See, e.g.,* Henry P. Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 Colum. L. Rev. 723, 738 (1988).[2]

We have no doubt, for example, that § 486(a) grants the President authority to issue a directive that prohibits executive agencies from entering into contracts with contractors who use a particular machine that the President has deemed less reliable than others that are available. Contractors that use the less reliable machines are less likely to deliver quality goods or to produce their goods in a timely manner. We see no distinction between this hypothetical order in which the President prohibits procurement from contractors that use machines that he deems unreliable and the one the President has actually issued, which would bar procurement with contractors that use labor relations techniques that the President deems to be generally unreliable, especially when the Secretary of Labor and the contracting agency head each confirm the validity of that generalization in each specific case.

The preamble of Executive Order No. 12954 sets forth the President's findings that the state of labor-management relations affects the cost, quality, and timely availability of goods and services. The order also announces his finding that the government's procurement interests in cost, quality, and timely availability are best secured by contracting with those entities that have "stable relationships with their employees" and that "[a]n important aspect of a stable collective bargaining relationship is the balance between allowing businesses to operate during a strike and preserving worker rights." The President has concluded that "[t]his balance is disrupted when permanent replacement employees are hired." In establishing the policy ordinarily[3] to contract with contractors that do not hire permanent replacement workers, the President has found that he will advance the government's procurement interests in cost, quality, and timely availability of goods and

---

[2] We do not mean to indicate a belief that Executive Order No. 12954 could not withstand a stricter level of scrutiny. We simply regard the employment of such a standard to be contrary to the holding of *Kahn*, as well as the view of the purposes of the FPASA and its legislative history upon which that decision expressly rests.

[3] Again, the order does not categorically bar procurement from contractors that have permanently replaced lawfully striking workers. The sanctions that the order would authorize would not go into effect if either the Secretary, with respect to either the termination or the debarment option, or the contracting agency head, with respect to the termination option, finds that the option would impede economy and efficiency in procurement.

services by contracting with those contractors that satisfy what he has found to be an important condition for stable labor-management relations.

The order's preamble then proceeds to set forth a reasonable relation between the government's procurement interests in economy and efficiency and the order itself. Specifically, the order asserts the President's finding that

> strikes involving permanent replacement workers are longer in duration than other strikes. In addition, the use of permanent replacements can change a limited dispute into a broader, more contentious struggle, thereby exacerbating the problems that initially led to the strike. By permanently replacing its workers, an employer loses the accumulated knowledge, experience, skill, and expertise of its incumbent employees. These circumstances then adversely affect the businesses and entities, such as the Federal Government, which rely on that employer to provide high quality and reliable goods or services.

We believe that these findings state the necessary reasonable relation between the procedures instituted by the order and achievement of the goal of economy and efficiency.

It may well be that the order will advance other permissible goals in addition to economy and efficiency. Even if the order were intended to achieve goals other than economy and efficiency, however, the order would still be authorized under the FPASA as long as one of the President's goals is the promotion of economy and efficiency in government procurement. "We cannot agree that an exercise of section 486(a) authority becomes illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well." *Carmen*, 669 F.2d at 821; *see Rainbow Nav., Inc. v. Dep't of the Navy*, 783 F.2d 1072 (D.C. Cir. 1986); Kimberley A. Egertòn, Note, *Presidential Power over Federal Contracts under the Federal Property and Administrative Services Act: The Close Nexus Test of AFL–CIO v. Kahn*, 1980 Duke L.J. 205, 218–20.

Since the adoption of the FPASA, Presidents have consistently regarded orders such as the one currently under review as being within their authority under that Act. As the court explained in *Kahn*, Presidents have relied on the FPASA as authority to issue a wide range of orders. 618 F.2d at 789–92 (noting the history of such orders since 1941, especially to institute "buy American" requirements and to prohibit discrimination in employment by government contractors). Not surprisingly this executive practice has continued since *Kahn*. For instance, President Bush issued Executive Order No. 12800, which required all government contractors to post notices declaring that their employees could not "be required to join a union or maintain membership in a union in order to retain their jobs."

57 Fed. Reg. 12,985 (Apr. 13, 1992). The order was supported solely by the statement that it was issued "in order to . . . promote harmonious relations in the workplace for purposes of ensuring the economical and efficient administration and completion of Government contracts." *Id.*[4] This long history of executive practice provides additional support for the President's exercise of authority in this case. *See Kahn*, 618 F.2d at 790.[5] This is especially so where, as here, the President sets forth the close nexus between the order and the statutory goals of economy and efficiency.

It may be that in individual cases, a contractor that maintains a policy of refusing to permanently replace lawfully striking workers may nevertheless have an unstable labor-management relationship while a particular contractor that has permanently replaced lawfully striking workers may have a more stable relationship. As to such situations, however, the Secretary and the contracting agency heads retain the discretion to continue to procure goods and services from contractors that have permanently replaced lawfully striking workers if that procurement will advance the federal government's economy and efficiency interests as articulated in section 1 of Executive Order No. 12954.[6] We recognize that, even with these safeguards, it could happen that a specific decision to terminate a contract for convenience or to debar a contractor pursuant to the order might not promote economy or efficiency. The courts have held that it remains well within the President's authority to determine that such occurrences are more than offset by the economy and efficiency gains associated with compliance with an order generally. *See Kahn*, 618 F.2d at 793.[7]

Similarly, it would be unavailing to contend that Executive Order No. 12954 will secure no immediate or near-term advancement of the federal government's economy and efficiency procurement interests. Section 486(a) authorizes the President to employ "a strategy of seeking the greatest advantage to the Government, *both short- and long-term,*" and this is "entirely consistent with the congressional policies behind the FPASA." *Id.* (emphasis added); *cf. Contractors Ass'n v. Sec-*

---

[4] This order is also significant insofar as it demonstrates that Executive Order No. 12954 is not the first in which a president has found that more stable workplace relations promote economy and efficiency in government procurement.

[5] "Of course, the President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect.' . . . [t]he 'construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.'" *Kahn*, 618 F.2d at 790 (quoting *Board of Governors of the Federal Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234 (1978), and *Miller v. Youakim*, 440 U.S. 125, 144 n.25 (1979)).

[6] The authority of an agency head is diminished somewhat, though not eliminated entirely, with respect to procuring from a contractor that the Secretary has debarred. An agency head may procure from a debarred contractor only for compelling reasons. *See* Exec. Order No. 12954, §4. Nevertheless, the Secretary has authority to refuse to place a contractor on the debarment list in the first instance if the Secretary believes that debarment would not advance economy and efficiency.

[7] "[W]e find no basis for rejecting the President's conclusion that any higher costs incurred in those transactions will be more than offset by the advantages gained in negotiated contracts and in those cases where the lowest bidder is in compliance with the voluntary standards and his bid is lower than it would have been in the absence of standards." *Kahn*, 618 F.2d at 793.

*retary of Labor,* 442 F.2d 159, 170 (3d Cir.) (deciding on basis of President's constitutional rather than statutory authority), *cert. denied,* 404 U.S. 854 (1971).

The FPASA grants the President a direct and active supervisory role in the administration of that Act and endows him with broad discretion over how best "to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency." *Kahn,* 618 F.2d at 788–89. As explained above, the President has set forth a sufficiently close nexus between the program to be established by the proposed order and the goals of economy and efficiency in government procurement.[8]

Finally, we do not understand the action of Congress in relation to legislation on the subject of replacement of lawfully striking workers to bear on the President's authority to issue Executive Order No. 12954. The question is whether the FPASA authorizes the President to issue the order. As set forth above, we believe that it does. Recent Congresses have considered but failed to act on the issue of whether to adopt a national, economy-wide proscription of the practice applying to all employers under the National Labor Relations Act ("NLRA").[9] This action may not be given the effect of amending or repealing the President's statutory authority, for the enactment of such legislation requires passage by both houses of Congress *and* presentment to the President. *See Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501

---

[8] Moreover, we note that under the Supreme Court's recent decision in *Dalton v. Specter,* 511 U.S. 462 (1994), it is unlikely that the President's judgment may be subjected to judicial review. It is clear that §486(a) gives the President the power to issue orders designed to promote economy and efficiency in government procurement. *See* 40 U.S.C. §486(a); *Carmen,* 669 F.2d at 821; *Kahn,* 618 F.2d at 788–89, 792–93. The Supreme Court has recently "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton,* 511 U.S. at 472. The Court held that

> where a claim "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."

*Id.* at 474 (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne,* 250 U.S. 163, 184 (1919)); *see also Smith v. Reagan,* 844 F.2d 195, 198 (4th Cir.), *cert. denied,* 488 U.S. 954 (1988); *Colon v. Carter,* 633 F.2d 964, 966 (1st Cir. 1980); *cf. Heckler v. Chaney,* 470 U.S. 821 (1985); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103 (1948).

Judicial review is unavailable for claims that the President had erred in his judgment that the program established in the order is unlikely to promote economy and efficiency. The FPASA entrusts this determination to the President's discretion and, under *Dalton,* courts may not second-guess his conclusion. The Court made it clear that the President does not violate the Constitution simply by acting ultra vires. *See Dalton,* 511 U.S. at 472–74. Judicial review is available only for contentions that the President's decision not only is outside the scope of the discretion Congress granted the President, but also that the President's action violates some free-standing provision of the Constitution.

[9] In the 102d Congress, The House of Representatives passed a bill to amend the National Labor Relations Act to make it an unfair labor practice for an employer to hire a permanent replacement for a lawfully striking employee. *See* H.R. 5, 102d Cong. (1991). The House passed this legislation on a vote of 247–182. *See* 137 Cong. Rec. 18,655 (1991). The Senate considered legislation to the same effect. *See* S. 55, 102d Cong. (1992). The legislation was not brought to the floor for a vote because supporters of the measure were only able to muster 57 votes to invoke cloture. *See* 138 Cong. Rec. 14,874–75 (1992).

Likewise, legislation to categorize the hiring of permanent replacement workers as an unfair labor practice was considered in the 103d Congress. The House of Representatives approved the legislation on a vote of 239–190. *See* 139 Cong. Rec. 12,867 (1993). Again, the Senate did not bring the bill to a vote, because its supporters were unable to attract the supermajority required to invoke cloture. *See* 140 Cong. Rec. 15,863 (1994) (fifty-three senators voting to invoke cloture).

U.S. 252 (1991); *INS v. Chadha*, 462 U.S. 919 (1983). To contend that Congress's inaction on legislation to prohibit all employers from hiring replacement workers deprived the President of authority he had possessed is to contend for the validity of the legislative veto.

In *Youngstown Sheet & Tube*, it was considered relevant that Congress had considered and rejected granting the President the specific authority he had exercised. 343 U.S. at 586. There, however, the President did not claim to be acting pursuant to any statutory power, but rather to inherent constitutional power. In such a case, the scope of the President's power depends upon congressional action in the field, including an express decision to deny the President any statutory authority. *Id. Youngstown Sheet & Tube* is inapposite here because the President does not rely upon inherent constitutional authority, but rather upon express statutory authority — § 486(a) of the FPASA. *See Kahn*, 618 F.2d at 787 & n.13.

Moreover, we note that Congress's action was far from a repudiation of the specific authority exercised in Executive Order No. 12954. Even if a majority of either house of Congress had voted to reject the blanket proscriptions on hiring permanent replacements for lawfully striking workers contained in H.R. 5 and S. 55, this would denote no more than a determination that such a broad, inflexible rule applied in every labor dispute subject to the NLRA would not advance the many interests that Congress may consider when assessing legislation. The order, by contrast, does not apply across the economy, but only in the area of government procurement. Nor does the order establish an inflexible application, rather it provides the Secretary of Labor an opportunity to review each case to determine whether debarring or terminating a contract with a particular contractor will promote economy and efficiency in government procurement and further permits any contracting agency head to override a decision to debar if he or she believes there are compelling circumstances or to reject a recommendation to terminate a contract if, in his or her independent judgment, it will not promote economy and efficiency. In sum, the congressional action alluded to above simply does not implicate the narrow context of government procurement or speak to the efficacy of a flexible case-by-case regime such as the one set forth in the order.[10]

The *Kahn* opinion fully supports this view. There the President promulgated voluntary wage and price guidelines that were applicable to the entire economy. Contractors that failed to certify compliance with the guidelines were debarred from most government contracts. *See* Exec. Order No. 12092, 43 Fed. Reg. 51,375 (1978). The order was issued in 1978 against the following legislative backdrop:

---

[10] We have found no indication in the legislative history that those opposing the proposed amendments to the NLRA even considered the specialized context of government procurement. *See, e.g.*, S. Rep. No. 103–110, at 35–49 (1993) (stating minority views); H.R. Rep. No. 103–116, pt. 1, at 42–62 (1993) (minority views); H.R. Rep. No. 103–116, pt. 2, at 16–17 (1993) (minority views); H.R. Rep. No. 103–116, pt. 3, at 11–15 (1993) (minority views). Moreover, we note that at least some of the opposition to the legislation was based in part on concerns regarding the breadth of the legislation, *see* H.R. Rep. No. 103–116, pt. 1, at 45 (minority views) (emphasizing absence of "a truly pressing *societal* need" (emphasis added)), as well as its inflexibility, *see id.* at 62 (views of Rep. Roukema).

In 1971 Congress passed the Economic Stabilization Act, which authorized the President to enforce economy-wide wage and price controls. In 1974, a few months after the Economic Stabilization Act expired, the Council on Wage and Price Stability Act ("COWPSA") was enacted. COWPSA expressly provided that "[n]othing in this Act . . . authorizes the continuation, imposition, or reimposition of any mandatory economic controls with respect to prices rents, wages, salaries, corporate dividends, or any similar transfers." Pub. L. No. 93–387, § 3(b), 88 Stat. 750 (1974).

The court concluded that "the standards in Executive Order 12092, which cover only wages and prices, are not as extensive as the list in Section 3(b). Consequently, we do not think the procurement compliance program falls within the coverage of Section 3(b), but rather is a halfway measure outside the contemplation of Congress in that enactment." *Kahn*, 618 F.2d at 795. Similarly, Executive Order No. 12954 is a measure that operates in a manner (case-by-case determination) and a realm (government procurement exclusively) that was outside the contemplation of Congress in its consideration of a broad and inflexible prohibition on the permanent replacement of lawfully striking workers.

## III.

Congress, in the FPASA, established that the President is to play the role of managing and directing government procurement. Congress designed this role to include "broad-ranging authority" to issue orders intended to achieve an economical and efficient procurement system. Executive Order No. 12954, "Ensuring the Economical and Efficient Administration and Completion of Federal Government Contracts," represents a valid exercise of this authority.

> WALTER DELLINGER
> *Assistant Attorney General*
> *Office of Legal Counsel*